NATIONAL ASSOCIATION FOR the ADVANCEMENT OF COLORED PEOPLE, a corporation,

N.A.A.C.P. Legal Defense and Educational Fund, Incorporated, a corporation, Plaintiffs,

v.

Kenneth C. PATTY, Attorney General for the Commonwealth of Virginia; T. Gray Haddon, Commonwealth's Attorney for the City of Richmond, Virginia; William J. Carleton, Commonwealth's Attorney for the City of Newport News, Virginia; Linwood B. Tabb, Jr., Commonwealth's Attorney for the City of Norfolk, Virginia; William J. Hassan, Commonwealth's Attorney for Arlington County, Virginia; and Frank N. Watkins, Commonwealth's Attorney for Prince Edward County, Virginia, Defendants.

Civ. A. Nos. 2435, 2436.

United States District Court
E. D. Virginia,
Richmond Division.

Jan. 21, 1958.

Sterling Hutcheson, Chief Judge, dissented in part.

Robert L. Carter, New York City, and Oliver W. Hill, Richmond, Va., for

Nat. Ass'n for the Advancement of Colored People.

Thurgood Marshall, New York City, and Spottswood W. Robinson, III, Richmond, Va., for N.A.A.C.P. Legal Defense and Educational Fund, Inc.

David J. Mays, Henry T. Wickham, John W. Edmonds, III, Richmond, Va., and Clarence F. Hicks, Asst. Atty. Gen., for defendants.

J. Segar Gravatt, Blackstone, Va., for Frank N. Watkins, Commonwealth's Atty. for Prince Edward County.

Before SOPER, Circuit Judge, HUTCHESON, Chief Judge, and HOFFMAN, District Judge.

SOPER, Circuit Judge.

These companion suits were brought by the National Association for the Advancement of Colored People and the N.A.A.C.P. Legal Defense and Educational Fund, Inc., corporations of the State of New York, against the Attorney General of the Commonwealth of Virginia and the Commonwealth Attorneys for the City of Richmond, the City of Newport News, the City of Norfolk, Arlington County and Prince Edward County, Virginia, to secure a declaratory judgment and an injunction restraining and enjoining the defendants from enforcing or executing Chapters 31, 32, 33, 35 and 36 [1] of the Acts of Assembly of the Commonwealth, all of which were passed at the Extra Session convened between August 27, 1956, and September 29, 1956, and were approved by the Governor of the Commonwealth on September 29, 1956.

The suits are based on the allegation that the statutes are unconstitutional and void, in that they deny to the plaintiffs rights accorded to them by the Fourteenth Amendment to the Constitution of the United States.

Jurisdiction is invoked under the civil rights statutes, 42 U.S.C. §§ 1981 and 1983 and 28 U.S.C. § 1343, under which

---

1. These Acts have been respectively codified in the Code of Virginia at §§ 18–349.9 et seq., 18–349.17 et seq., 54–74, 78, 79, 18–349.25 et seq., and 18–349.31 et seq.

the district courts have jurisdiction of actions brought to redress the deprivation under color of state law of any right, privilege or immunity secured by the Constitution or statutes of the United States providing for equal rights of all persons within the jurisdiction of the United States. Jurisdiction is also invoked under 28 U.S.C. §§ 1331 and 1332 wherein jurisdiction is conferred upon the federal courts in all civil actions where the matter in controversy exceeds the sum of $3,000 exclusive of interest and costs and arises under the Constitution and law of the United States or between citizens of different states. Accordingly, the present three-judge district court was set up under 28 U.S.C. § 2281 and evidence was taken upon which the following findings of facts are based.

The National Association for the Advancement of Colored People is a nonprofit membership organization which was established in 1909 and incorporated under the laws of the State of New York in 1911. It is licensed to do business as a foreign corporation in the State of Virginia. The purposes of the corporation are set out in the statement of its charter:

"That the principal objects for which the corporation is formed are voluntarily to promote equality of rights and eradicate caste or race prejudice among the citizens of the United States; to advance the interests of colored citizens; to secure for them impartial suffrage; and to increase their opportunities for securing justice in the courts, education for their children, employment according to their ability, and complete equality before the law.

"To ascertain and publish all facts bearing upon these subjects and to take any lawful action thereon; together with any and all things which may lawfully be done by a membership corporation organized under the laws of the State of New York for the further advancement of these objects."

The activities of the Association cover forty-four states, the District of Columbia and the Territory of Alaska. It is the most important Negro rights organization in the country (see 6 Western Res.L.Rev. 101, 102; 58 Yale L.J. 574, 581), having approximately 1,000 unincorporated branches. A branch consists of a group of persons in a local community who enroll the minimum number of members and upon formal application to the main body are granted a charter. In Virginia, there are eighty-nine active branches. A person becomes a member of a branch upon payment of dues which amount, at a minimum, to $2 per year and may be more at the option of the member, up to the sum of $500 for life membership. The regular dues of $2 per year are divided into two parts, one-half being sent to the national office in New York and one-half retained by the local branch.

In a number of states, including Virginia, the branches are voluntarily grouped into an unincorporated State Conference, the expenses of which are paid jointly by the national organization and the local branches, each contributing 10-cents out of its share of each member's dues. In Virginia, the branches contribute a greater sum for the support of their State Conference.

The principal source of income of the Association and its branches in the several states consists of the membership fees which are solicited in local membership drives. Other income is derived from special fund raising campaigns and individual contributions. In the first eight months of the year the greater number of annual membership drives are conducted. During that period in 1957 the Association enrolled 13,595 members in Virginia. This represents a sharp reversal of the rising trend in membership figures in the same eight-month period in the preceding three years, which showed 13,583 members in 1954, 16,130 in 1955 and 19,436 in 1956. The income of the Association from its Virginia branches during the first eight

months of 1957 was $37,470.60 as compared with $43,612.75 for the same period in 1956. The total amount received by the Association from Virginia was $38,469.59 in the first eight months of 1957 as compared with $44,138.71 for the same period in 1956. The total income of the Association from the country as a whole for the year 1956 was $598,612.84 and $425,608.13 for the first eight months of 1957.

At the top of the organizational structure of the national body is the annual convention, which consists of delegates representing the 1,000 branches in the several states. It has the power to establish policies and programs for the ensuing year which are binding upon the Board of Directors and upon the branches of the Association. Each year the convention chooses sixteen members of a Board of forty-eight Directors, each of whom serves for a term of three years. The Board of Directors meets eleven times a year to carry out the policies laid down by the convention. Under the Board an administrative staff is set up, headed by an executive secretary who, representing the Board, presides over the functioning of the local branches and State Conferences throughout the country under the authority of the constitution and by-laws of the national body.

The Virginia State Conference takes the lead of the Association's activities in the state under the administration of a full time salaried executive secretary, by whom the activities of the branches in the state are co-ordinated and local membership and fund raising campaigns are supervised. The State Conference also holds annual conventions attended by delegates from the branches, who elect officers and members of the Board of Directors of the Conference. Through its representatives the State Conference appears before the General Assembly of Virginia and State Commissions in support of or in opposition to measures which in its view advance or retard the status of the Negro in Virginia. It encourages Negroes to comply with the statutes of the state so as to qualify themselves to vote, and it conducts educational programs to acquaint the people of the state with the facts regarding racial segregation and discrimination, and to inform Negroes as to their legal rights and to encourage the assertion of those rights when they are denied. In carrying out this program, the public is informed of the policies and objectives of the Association through public meetings, speeches, press releases, newsletters and other media.

One of the most important activities of the State Conference, perhaps its most important activity, is the contribution it makes to the prosecution of law suits brought by Negroes to secure their constitutional rights. It has been found, through years of experience, that litigation is the most effective means to this end when Negroes are subjected to racial discrimination either by private persons or by public authority. Accordingly, the Virginia State Conference maintains a legal committee or legal staff composed of thirteen colored lawyers located in seven communities scattered over the greater part of the state. The members of the legal staff are elected at the annual convention of the State Conference and they in turn elect a chairman. Ordinarily the legal staff is called into action upon a complaint made to one or more members of the staff by aggrieved parties, but sometimes a grievance is brought directly to the attention of the Executive Secretary of the Conference, and if in his judgment the case presents a genuine grievance involving discrimination on account of race or color, which falls within the scope of the work of the Association, he refers the parties to the Chairman of the legal staff. If the Chairman approves the complaint, he recommends favorable action to the President of the State Conference and if he concurs, the Conference obligates itself to defray in whole or in part the costs and expenses of the litigation. With rare exceptions the attorneys selected by the complainant to bring the suit have been members of the legal

staff. When a law suit has been completed the attorney is compensated by the Conference for out-of-pocket expenditures, including travel and stenographic services, and is also paid per diem compensation for the time spent in his professional capacity. No money ever passes directly to the plaintiff or litigant. The attorneys appear in the course of the litigation for and on behalf of the individual litigants, who in every instance authorize the institution of the suit.

In brief, the Association, in various forms, publicizes its policies against discrimination and informs the public that it will offer aid for the prosecution of a legitimate complaint involving improper discrimination. Thus it is generally known that the State Conference will furnish money for litigation if the proper need arises, but the Association does not take the initiative and does not act until some individual comes to it asking for help.

Sometimes a complainant seeks damages for violation of his rights, as in cases involving the treatment accorded Negroes in public conveyances. In such a case, the Association ordinarily does not furnish aid if the complainant is financially able to prosecute his claim. In the most fruitful field of litigation in respect to public education, the rights of large numbers of colored people in the community are involved and a class suit is brought; and the Association pays the expenses even if one or more of the complainants is possessed of financial resources. In most of these cases the expenses of the suit are so great that it could not be prosecuted without outside aid. The fees paid the lawyers are modest in size and less than they would ordinarily earn for the time consumed.

The N.A.A.C.P. Legal Defense and Educational Fund, Inc., the plaintiff in the second suit, also takes a prominent part in support of litigation on behalf of Negro citizens. It is a membership corporation which was incorporated under the law of the State of New York in 1940. Like the Association, the Fund is registered with the Virginia Corporation Commission as a foreign corporation doing business in the state. It was formed, as its name implies, to assist Negroes to secure their constitutional rights by the prosecution of law suits of the sort that have just been described. The charter declares that its purposes are to render legal aid gratuitously to Negroes suffering "legal injustice" by reason of race or color who are unable on account of poverty to employ and engage legal aid on their own behalf. Other purposes are to secure educational facilities for Negroes who are denied the same by reason of their race and color and to conduct research and to compile and publish information on this subject and generally on the status of the Negro in American life. The charter forbids the corporation to attempt to influence legislation by propaganda or otherwise and requires it to operate without pecuniary benefit to its members. The charter was approved by a New York court after service upon and without objection from the local bar association so that it obtained the right under the law of New York to operate as a legal aid society.

The Fund is governed by a Board of Directors which, under its charter, consists of not less than five and not more than fifty members. Its work is directed by the usual executive officers. It operates from an office in New York City and has no subordinate units. It employs a full-time staff of six resident attorneys and three research attorneys stationed in New York City, and it keeps four lawyers on annual retainers in Richmond, Dallas, Los Angeles and Washington. It also engages local attorneys for investigation and research in particular cases. It has on call one hundred lawyers throughout the country and a large number of social scientists who operate on a voluntary basis and work without pay or upon the payment of expenses only. By virtue of its efforts to secure equal rights and opportunities for colored citizens in the United States, the Fund has become regarded as an instru-

ment through which colored citizens of the United States may act in their efforts to combat unconstitutional restrictions based upon race and color.

In order to give information as to the nature of the work of the Fund, members of the legal staff engage in public speaking and lectures in colleges and universities throughout the country on a variety of subjects connected with the legal rights of colored citizens and the race problem in general. But in conformity with the charter of the Fund, the officers and employees of the corporation do not attempt to influence legislation, by propaganda or otherwise.

It is apparent that so far as litigation is concerned the purposes of the Association and of the Fund are identical, and they in fact co-operate in this activity. They are, however, separate corporate bodies with separate offices. At one time some of the executive officers were in the employ of both corporations but at the present no person serves as an officer or employee, although many persons are members of both bodies. The Fund was formed as a separate organization because it was thought that it should have no part in attempting to influence legislation and the complete separation has been promoted by rulings of the Treasury Department, which disallow tax deductions for contributions to organizations engaged in political activity. Deductions for contributions to the Fund are allowed.

The revenues of the Fund are derived solely from contributions received in response to letters sent out four times a year throughout the country by the Committee of One Hundred and, to some extent, from solicitations at small luncheons or dinners. There are no membership dues. The Committee of One Hundred was organized in 1941 by Dr. Neilsen, former president of Smith College, and consists predominantly of educators and lawyers who have joined together for the purpose of raising the money necessary to keep the organization going. Most of the money comes in the form of $5 and $10 contributions. Sub-

stantial sums are received from charitable foundations, of which the largest was $15,000 and the aggregate was $50,000 in 1956. For the four or five years prior to 1957 the income showed a steady increase. The income for 1956 was $351,283.32. For the first eight months of 1955, 1956 and 1957 the income was $152,000, $246,000 and $180,000, respectively. The receipts from Virginia were $1,469.50 in 1954; $6,256.19 in 1955, a portion of which was a refund from prior litigation; $1,859.20 in 1956, and $424 for the first eight months in 1957.

The total disbursements of the Fund for the year 1956 were $268,279.03. The total expenses for Virginia during the past four years consisted principally of the sum of $6,000, which was the annual retainer of the regional counsel.

The Fund supplements the work of the legal staff of the Virginia State Conference by contributing the services of the regional counsel and, more particularly, by furnishing results of the research of scientists, lawyers and law professors in various parts of the country. The Fund also contributes the very large expenditures which are needed for the prosecution of important cases that go from the federal courts in Virginia and other states to the Supreme Court of the United States in which the fundamental rules governing racial problems are laid down. In this class of case the expenses amount to a sum between $50,000 and $100,000, and in the celebrated case of Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, the expenses amounted to a sum in excess of $200,000. The expenses of cases tried in the lower courts, including an appeal to the Court of Appeals for the Circuit, amount to approximately $5,000.

The Fund has made only a superficial investigation into the financial competency of complainants to whom it has rendered aid in Virgina. For the most part the cases have been class actions brought for the benefit of all the colored citizens in a community with children in the local public schools and the regional counsel of the Fund has entered the

cases at the request of members of the legal staff of the State Conference. It has been obvious in such instances that the burden of the litigation was too great for the individual litigants to bear, and the lawyers for the Fund have not regarded their participation as a violation of the charter provision authorizing the Fund to aid indigent litigants even if it was shown that some of the complainants in a case had legal title to homes of substantial value.[2]

## STATUTES IN SUIT

The five statutes against which the pending suits are directed, that is Chapters 31, 32, 33, 35 and 36 of the Acts of the General Assembly of Virginia, passed at its Extra Session in 1956, were enacted for the express purpose of impeding the integration of the races in the public schools of the state which the plaintiff corporations are seeking to promote. The cardinal provisions of these statutes are set forth generally in the following summary.

Chapters 31 and 32 are registration statutes. They require the registration with the State Corporation Commission of Virginia of any person or corporation who engages in the solicitation of funds to be used in the prosecution of suits in which it has no pecuniary right or liability, or in suits on behalf of any race or color, or who engages as one of its principal activities in promoting or opposing the passage of legislation by the General Assembly on behalf of any race or color, or in the advocacy of racial integration or segregation, or whose activities tend to cause racial conflicts or violence. Penalties for failure to register in violation of the statutes are provided.

Chapters 33, 35 and 36 relate to the procedure for suspension and revocation of licenses of attorneys at law, to the crime of barratry and to the inducement and instigation of legal proceedings. It is made unlawful for any person or corporation: to act as an agent for another who employs a lawyer in a proceeding in which the principal is not a party and has no pecuniary right or liability; or to accept employment as an attorney from any person known to have violated this provision; or to instigate the institution of a law suit by paying all or part of the expenses of litigation, unless the instigator has a personal interest or pecuniary right or liability therein; or to give or receive anything of value as an inducement for the prosecution of a suit, in any state or federal court or before any board or administrative agency within the state, against the Commonwealth, its departments, subdivisions, officers and employees; or to advise, counsel, or otherwise instigate the prosecution of such a suit against the Commonwealth, etc., unless the instigator has some interest in the subject or is related to or in a position of trust toward the plaintiff. Penalties for the violation of these statutes are provided.

The legislative history of these statutes to which we now refer conclusively shows that they were passed to nullify as far as possible the effect of the decision of the Supreme Court in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 and 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083.

## LEGISLATIVE HISTORY OF STATUTES IN SUIT

On May 17, 1954, the Supreme Court in Brown v. Board of Education, 347 U. S. 483, 74 S.Ct. 686, 98 L.Ed. 873, after argument and reargument, denounced the segregation of the races in public education as a violation of the equal protection clause of the Fourteenth Amendment, and requested the parties as well as the attorneys general of the affected states to file briefs and present

---

2. Testimony as to the activities of the Association and of the Fund was given in large part by Roy Wilkins, executive secretary of the Association; Thurgood Marshall, director counsel of the Fund; W. Lester Banks, executive secretary of the Virginia State Conference; Oliver W. Hill, chairman of the legal staff of the Virginia State Conference; Spottswood W. Robinson III, southeast regional counsel for the Fund.

further argument to assist the court in formulating its decrees.[3]

On May 31, 1955, the Supreme Court, after further argument, reaffirmed its position, reversed the judgments below and remanded the cases to the lower courts to take such proceedings as should be necessary and proper to admit the parties to the public school on a racially non-discriminatory basis with all deliberate speed.

Amongst the cases in the group considered by the Supreme Court was Davis v. County School Board of Prince Edward County, Virginia, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083, which was instituted on May 23, 1951, on behalf of colored children of high school age in that county. The case had been tried by a three-judge district court after the Commonwealth of Virginia had been permitted to intervene. The court upheld the validity of the constitutional and statutory enactments of the state which required the segregation of the races in the state schools, but found that the buildings, curricula and transportation furnished the colored children were inferior to those furnished the white children and ordered the defendants to remedy the defects with diligence and dispatch. 103 F.Supp. 337. As we have seen, this decision was reversed by the Supreme Court on the constitutional point and the duty to eliminate segregation was directly presented to the State authorities.[4] Their reaction is depicted in the following recital.

On August 30, 1954, the Governor of Virginia appointed the Gray Commission on Public Education, composed of thirty-two members of the General Assembly, and directed it to study the effect of the segregation decisions and make such

recommendations as might be deemed proper. The Commission submitted its final report to the Governor on November 11, 1955. Referring to prior decisions of the Supreme Court and to the non-judicial authority cited by it in support of the segregation decision, the Commission characterized the latter in the following terms:

"With this decision, based upon such authority, we are now faced. It is a matter of the gravest import, not only to those communities where problems of race are serious, but to every community in the land, because *this decision transcends the matter of segregation in education.* [emphasis added] It means that irrespective of precedent, long acquiesced in, the Court can and will change its interpretation of the Constitution at its pleasure, disregarding the orderly processes for its amendment set forth in Article V thereof. It means that the most fundamental of the rights of the states and of their citizens exist by the Court's sufferance and that the law of the land is whatever the Court may determine it to be by the process of judicial legislation."

The Commission's general conclusion was that "separate facilities in our public schools are in the best interest of both races, educationally and otherwise, and that compulsory integration should be resisted by all proper means in our power". To this end the Commission recommended that a special session of the General Assembly be called to authorize the holding of a constitutional convention in order to amend § 141 of the Constitution of Virginia which shortly before had been held by the Su-

3. On the same day, in Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884, the Court held that segregation in the public schools in the District of Columbia is a denial of the due process clause of the Fifth Amendment.

4. On remand, after the filing of numerous motions and the rendering of arguments thereon, the Court entered a decree en-

joining racial discrimination in school admission but refused to set a time limit within which the Board should begin compliance, observing the likelihood of the schools being closed under state law. D.C., 149 F.Supp. 431. This refusal was reversed on appeal, Allen v. County School Board of Prince Edward County, Va., 4 Cir., 249 F.2d 462.

preme Court of Appeals of Virginia in Almond v. Day, 197 Va. 419, 89 S.E.2d 851, to prohibit the payment of tuition and other expenses of students who may not desire to attend public schools. The Commission also recommended that legislation be passed conferring broad discretion upon the school authorities to assign pupils in the public schools and to provide for the expenditure of State funds in the payment of tuition grants so as to prevent enforced integration. In response to this recommendation, the General Assembly, on December 3, 1955, meeting in Extra Session, enacted a bill, submitting to the voters of the state the question whether such a convention should be held, and on January 9, 1956, the holding of the convention was approved by the voters.

On February 1, 1956, the General Assembly in its regular session adopted an "interposition resolution" by votes of 36-to-2 in the Senate and 90-to-5 in the House of Delegates. In this resolution the following declarations were included:

"That by its decision of May 17, 1954, in the school cases, the Supreme Court of the United States placed upon the Constitution an interpretation, having the effect of an amendment thereto, which interpretation Virginia emphatically disapproves; * * *

"That with the Supreme Court's decision aforesaid and this resolution by the General Assembly of Virginia, a question of contested power has arisen: The court asserts, for its part, that the States did, in fact, in 1868, prohibit unto themselves, by means of the Fourteenth Amendment, the power to maintain racially separate public schools, which power certain of the States have exercised daily for more than 80 years; the State of Virginia, for her part, asserts that she has never surrendered such power;

"That this declaration upon the part of the Supreme Court of the United States constitutes a deliberate, palpable, and dangerous attempt of the court itself to usurp the amendatory power that lies solely with not fewer than three-fourths of the States; * * *

"That Virginia, anxiously concerned at this massive expansion of central authority, * * * is in duty bound to interpose against these most serious consequences, and earnestly to challenge the usurped authority that would inflict them upon her citizens. * * *

"And be it finally resolved, that until the question here asserted by the State of Virginia be settled by clear Constitutional amendment, we pledge our firm intention to take all appropriate measures honorably, legally and constitutionally available to us, to resist this illegal encroachment upon our sovereign powers, and to urge upon our sister States, whose authority over their own most cherished powers may next be imperiled, their prompt and deliberate efforts to check this and further encroachment by the Supreme Court, through judicial legislation, upon the reserved powers of the States." Acts 1956, pp. 1213, 1214.

The constitutional convention authorized by the voters was held on March 7, 1956, and amended § 141 of the constitution of the state in accordance with the recommendation of the Gray Commission.

On August 27, 1956, the General Assembly was convened in Extra Session in response to the call of the Governor of the State. He made an opening address to the assembled lawmakers,[5] in the course of which he said:

"The people of Virginia, and their elected representatives, are con-

---

5. Sec. 73 of the Virginia Constitution provides: "The Governor shall * * * recommend to (the General Assembly's) consideration such measures as he may deem expedient, and convene the General Assembly * * * when, in his opinion, the interest of the State may require."

fronted with the gravest problems since 1865. Beginning with the decision of the Supreme Court of the United States on May 17, 1954, there has been a series of events striking at the very fundamentals of constitutional government and creating situations of the utmost concern to all our people in this Commonwealth, and throughout the South.

"Because of the events I have just mentioned, I come before you today for the purpose of submitting recommendations to continue our system of segregated public schools * * *

"The principal bill which I submit to you at this time defines State policy and governs public school appropriations accordingly. The declaration reads, in part, as follows:

" 'The General Assembly declares, finds and establishes as a fact that the mixing of white and colored children in any elementary or secondary public school within any county, city or town of the Commonwealth constitutes a clear and present danger * * * and that no efficient system of elementary and secondary public schools can be maintained in any county, city or town in which white and colored are taught in any such school located therein.'

"The bill then defines efficient systems of elementary and secondary public schools as those systems within a county, city or town in which there is no student body, in the respective categories, in which white and colored children are taught. Following these definitions is this further declaration:

" 'The General Assembly for the purpose of protecting the health and welfare of the people and in order to preserve and maintain an efficient system of public elementary and secondary schools hereby declares and establishes it to be the policy of this Commonwealth that no public elementary or secondary schools in which white and colored children are mixed and taught shall be entitled to or shall receive any funds from the State Treasury for their operation, and, to that end, forbids and prohibits the expenditure of any part of the funds appropriated * * * for the establishment and maintenance of any system of public elementary or secondary schools, which is not efficient.'

"This policy is in harmony with § 129 of the State Constitution, which provides that 'The General Assembly shall establish and maintain an efficient system of public free schools throughout the state.' Manifestly, integration of the races would make impossible the operation of an efficient system. By this proposed legislation, the General Assembly, properly exercising its authority under the Constitution, will clearly define what constitutes an efficient system for which State appropriations are made."

The purpose for which the Extra Session was called was emphasized in the following exhortation with which the Governor concluded his address:

"The proposed legislation recognizes the fact that this is the time for a decisive and clear answer to these questions:

"(1) Do we accept the attempt of the Supreme Court of the United States, without constitutional or any other legal basis, to usurp the rights of the States and dictate the administration of their internal affairs? (2) De we accept integration? (3) Do we want to permit the destruction of our schools by permitting 'a little integration' and witness its subsequent sure and certain insidious spread throughout the Commonwealth? My answer is a positive 'No'. On the other hand, shall we take all appropriate measures honorably, legally and constitutionally available to us, to resist this illegal encroachment upon our sovereign powers? My answer is a

definite 'Yes' and I believe it is to be the answer of the vast majority of the white people of Virginia, as well as the answer of a large, if unknown, number of Negro citizens."

The Legislature responded at once to the Governor's appeal. The principal bill to which he referred in his address became Chapter 71 of the Acts passed at the Extra Session. It appropriated funds for the maintenance of the elementary and secondary schools of the state for the ensuing biennium and included the declarations above set out, whereby the use of the funds for integrated schools are prohibited. An accompanying Act, Chapter 70, known as the Pupil Placement Act, requires each pupil to attend his present segregated school unless a transfer is authorized by a Pupil Placement Board appointed by the Governor; and the Board is required to consider the effect of its decisions upon the efficiency of the schools which, according to the declarations of the Legislature, can be maintained only by preserving segregation of the races. A review of the decisions of the Board is provided through a cumbersome and costly procedure. Another companion statute, Chapter 68, provides that if children of both races are enrolled in the same school by any school authorities acting voluntarily or under the compulsion of an order of court, the school shall be closed and removed from the public school system and the control of the school shall be vested in the state and not reopened until the Governor finds that it can be done without enforced integration.

The Pupil Placement Act was considered at length and held unconstitutional by this court in Adkins v. School Board of City of Newport News, Va., 148 F. Supp. 430, wherein the terms of the Act are set out in full and the legislative history is reviewed. The opinion of the court pointed out that the administrative remedy afforded to an aggrieved person by the Act would consume at least 105 days between the filing of the protest and the final decision which was lodged in the hands of the Governor. On appeal the judgment of the District Court was affirmed, 4 Cir., 246 F.2d 325, certiorari denied 355 U.S. 855, 78 S.Ct. 83, 2 L.Ed. 2d 63.

### EFFECT OF PASSAGE OF STATUTES IN SUIT

It was in this setting [6] that the Acts now before the court were passed as parts of the general plan of massive resistance to the integration of schools of the state under the Supreme Court's decrees. The agitation involved in the widespread discussion of the subject and the passage of the statutes by the Legislature have had a marked effect upon the public mind which has been reflected in hostility to the activities of the plaintiffs in these cases. This has been shown not only by the falling off

---

**6.** While it is well settled that a court may not inquire into the legislative motive (Tenney v. Brandhove, 341 U.S. 367, 377, 71 S.Ct. 783, 95 L.Ed. 1019), it is equally well settled that a court may inquire into the legislative purpose. (See Baskin v. Brown, 4 Cir., 174 F.2d 391, 392–393, and Davis v. Schnell, D.C., 81 F.Supp. 872, 878–880, affirmed 336 U.S. 933, 69 S.Ct. 749, 93 L.Ed. 1093, in which state efforts to disenfranchise Negroes were struck down as violative of the Fifteenth Amendment.) Legislative motive—good or bad—is irrelevant to the the process of judicial review; but legislative purpose is of primary importance in determining the propriety of legislative action, since the purpose itself must be within the legislative competence, and the methods used must be reasonably likely to accomplish that purpose. Because of this necessity, a study of legislative purpose is of the highest relevance when a claim of unconstitutionality is put forward. Usually a court looks into the legislative history to clear up some statutory ambiguity, as in Davis v. Schnell, D.C., 81 F.Supp. at page 878; but such ambiguity is not the *sine qua non* for a judicial inquiry into legislative history. See the decision in Lane v. Wilson, 307 U.S. 268, 59 S.Ct. 872, 83 L.Ed. 1281, in which the Supreme Court showed that the state statute before the court was merely an attempt to avoid a previous decision in which the "grandfather" clause of an earlier statute had been held void.

of revenues, indicated above, but also by manifestations of ill will toward white and colored citizens who are known to be sympathetic with the aspirations of the colored people for equal treatment, particularly in the field of public education. A number of white citizens who attempted to give aid to the movement by speaking out on behalf of the colored people, or by taking membership in the Association, or joining the complainants in school suits, have been subjected to various kinds of annoyance. When their names appeared in the public press in connection with these activities they were besieged day and night by telephone calls which were obscene, threatening, abusive, or merely silent interruptions to the peace and comfort of their homes. Letters and telegrams of like nature were also received. Some of these persons found themselves cut by their friends and made unwelcome where they had formerly been received with kindness and respect. Two crosses were burned near the homes of two of them; an effigy was hung in the yard of a white plaintiff in a school case, and a hearse was sent to the home of the colored president of the Norfolk branch of the Association during his absence "to pick up his body." The last mentioned person was also chairman of the local branch of a labor union and a man of prominence in his community. He had been active and successful in directing membership campaigns for the Association in prior years but in 1957 he found that the solicitors were unwilling to continue their work. Colored lawyers on the State Conference legal staff were assailed with fear that enforcement of the statutes now before this court would result in loss of their licenses to practice should they continue their activities on the Association's behalf. Numerous newspaper articles offered in evidence show that the proposal to integrate the schools was a prime subject of public interest and discussion throughout the state. They are received over objections by the defendants only as evidence of this fact and not to prove the accuracy of the statements therein contained. In view of all the evidence, we find that the activities of the State authorities in support of the general plan to obstruct the integration of the races in schools in Virginia, of which plan the statutes in suit form an important part, brought about a loss of members and a reduction of the revenues of the Association and made it more difficult to accomplish its legitimate aims.

The defendants on their own behalf produced as witnesses six of the plaintiffs in the Prince Edward County school case. All of them had been visited by representatives of the Boatwright Committee of the Legislature, which had been created by Chapter 34 of the Acts passed at the Extra Session, and had been authorized to make a thorough investigation into the activities of corporations or associations which seek to influence, encourage or promote litigation relating to racial activities in the State. These witnesses testified either that they did not know that they were parties to the Prince Edward suit or that they merely wanted better schools for their children and did not want integrated schools. They also testified that they suffered no mistreatment by reason of their names being used as plaintiffs in the suit. The evidence, however, shows that the first step leading to the litigation in Prince Edward County was a strike of the children in the colored high school who refused to attend classes for a period of two weeks as a protest against the undesirable conditions in the school. After the strike there were meetings of the parents in the school building and in the nearby Baptist Church which were addressed by lawyers of the legal staff of the Virginia State Conference of the Association, who were in attendance at the request of the parents of the children, as well as by other persons. The speakers expressed the opinion that in order to secure fair treatment for the colored pupils it would be necessary to institute a suit for the establishment of an integrated school. It was further shown that each of the six witnesses had signed a paper authorizing Hill, Martin and Rob-

inson, attorneys, to act for and on behalf of them and their children to secure such educational opportunities as they might be entitled to under the Constitution and laws of the United States and to represent them in all suits of whatever kind pertaining thereto. The record in the Prince Edward case shows that 186 persons were joined as parties plaintiff.

The Attorney General of Alabama testified as to racial disturbances and disorders in 1955 and 1956 arising in his State in connection with the attempt to enroll colored students in white schools and involving acts of violence and personal injury to colored persons. He attributed these activities in large part to white men associated in a splinter organization of the Ku Klux Klan and expressed the opinion that the registration of members of the organization under an act like Chapter 32 in this case would aid in the identification and successful prosecution of the offenders. Similarly he thought it would be helpful to require the registration of members of a Negro organization in Tuskegee, which succeeded in some measure to the work of the N. A. A. C. P. after it had been enjoined from operating in Alabama and had engaged in boycotting white merchants in the community and for this purpose had engaged in threats and acts of intimidation. The Attorney General conceded that he was hostile to the N. A. A. C. P. and had filed suit against it in his State demanding a list of its members, but that he had not filed such suit against the Ku Klux Klan.

The sheriffs of four southside Virginia counties in which the Negro population ranges from 45 per cent to 54 per cent, and in one instance to 77 per cent of the total, testified that the relation of the races in their jurisdictions was good but that in their opinion integration in the public schools would result in disturbances and, perhaps, in bloodshed; and that a list of persons active in racial matters would aid them in preserving the peace and in selecting deputies to enforce the law. We find that the opposition to integration in the public schools is especially strong in this section of Virginia. The Superintendent of the Virginia State Police agreed with the opinion that lists of persons active in racial matters would help law enforcement even though the lists might contain thirteen or fourteen thousand names.

A representative of the law department of the Association of American Railroads testified for the defendants that through investigations he had become familiar with the solicitation of personal injury claims by attorneys, and generally with the offenses of barratry and running and capping; and that such activities occur in Virginia and that the information required to be filed under Chapter 31 of the Acts of the Extra Session would be helpful in investigating such activities.

Mr. C. Harrison Mann, Jr., a lawyer and a delegate to the General Assembly, testified on behalf of the defendants that he was the chief patron of the Acts of Legislature now in suit and that he was moved by two purposes in connection with the legislation. He was alarmed at the activities of a white leader who is violently fighting integration in the eastern part of the United States and was operating in Washington shortly before the Extra Session convened. It was the opinion of the witness that these activities would lead to racial tension and possibly violence and that it was highly desirable that the identities of the responsible people be made known by registration. With respect to the passage of the Acts relating to the practice of law in Virginia, the delegate was influenced by reports in the press that certain persons were joined as plaintiffs in the Prince Edward suit without knowledge that integration of the races in the schools was at issue and that in other parts of the country there were reports that the Association was soliciting the institution of suits by plaintiffs and practicing law, which he considered to be a breach of legal ethics and bad public policy. He also gave evidence

that he was subject to abuse from various sources by reason of his activities.

## DEFENDANTS' MOTIONS TO DISMISS CIVIL RIGHTS OF CORPORATIONS

After the institution of the pending suits the defendants filed motions to dismiss in each case on the ground that the complaints did not state a controversy over which the court had jurisdiction. The motions were dismissed after argument and the defendants were required to answer with leave to renew the contention after the hearing on the evidence. They now dispute the jurisdiction of the Court, first, on the ground that a corporation is not a person entitled to bring suit for deprivation of rights, privileges or immunities granted by the Constitution or laws of the United States under 42 U.S.C. § 1983, over which jurisdiction is conferred upon the district courts by 28 U.S.C. § 1343(3). It is pointed out that these sections are derived from the Civil Rights Act of 1871, which was enacted to give effect to the provisions of the Fourteenth Amendment and thereby to prevent the deprivation of the rights of natural persons under the color of any state law. Reliance is placed chiefly on the concurring opinion of Justice Stone in Hague v. C. I. O., 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423, where suit was brought by individual citizens and a membership corporation who claimed that under an ordinance of Jersey City they were deprived of the privilege of free speech and free assembly secured to them as citizens of the United States by the Fourteenth Amendment. The ordinance was held unconstitutional as an undue restriction of these rights and relief was granted to the individual plaintiffs but denied to a corporate plaintiff for the reason expressed in the opinion of Justice Roberts (307 U.S. at page 514, 59 S.Ct. at page 963,) that "natural persons, and they alone, are entitled to the privileges and immunities which Section 1 of the Fourteenth Amendment secures for 'citizens of the United States'." This holding that corporations are not "citizens"

within this clause of the Fourteenth Amendment is not disputed; but Justice Stone, who concurred in the judgment but differed with the reasons expressed by his colleagues, wrote a separate opinion in which he went further and made the following statement (307 U.S. at page 527, 59 S.Ct. at page 969):

"Since freedom of speech and freedom of assembly are rights secured to persons by the due process clause, all of the individual respondents are plainly authorized by § 1 of the Civil Rights Act of 1871 to maintain the present suit in equity to restrain infringement of their rights. As to the American Civil Liberties Union, which is a corporation, it cannot be said to be deprived of the civil rights of freedom of speech and of assembly, for the liberty guaranteed by the due process clause is the liberty of natural, not artificial, persons. Northwestern Nat. Life Ins. Co. v. Riggs, 203 U.S. 243, 255, 27 S.Ct. 126, 129, 51 L.Ed. 168; Western Turf Ass'n v. Greenberg, 204 U.S. 359, 363, 27 S.Ct. 384, 385, 51 L.Ed. 520."

This pronouncement supports the defendants' position but it cannot be said to be a controlling authority since it did not represent the views of the majority of the Court but was concurred in only by Justice Reed (see City of Manchester v. Leiby, 1 Cir., 117 F.2d 661, 663, 664).

It is of more importance to note that the opinion of Justice Stone did not discuss the prior decision of the Court in Grosjean v. American Press Co., 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660, where a license tax on advertisement was held invalid at the suit of a newspaper corporation. The Court held (297 U.S. at page 244, 56 S.Ct. at page 446) that freedom of speech and of the press are fundamental rights safeguarded by the due process of law clause of the Fourteenth Amendment against abridgement by state legislation, and although a corporation is not a *citizen* within the meaning of the privileges and immunities

clause, it is a *person* within the meaning of the equal protection and due process clause of that amendment. In other words, the corporation was accorded rights to which it would not have been entitled if the rule announced by Justice Stone had been applied.

 Subsequent cases have extended this broad interpretation of the word "person" in the Civil Rights Act and have held that a corporation is a person within that Act entitled to challenge the deprivation of rights under color of a state statute to which a money valuation could not be applied. Thus in McCoy v. Providence Journal Co., 1 Cir., 190 F.2d 760, it was held that a newspaper corporation, as well as individual persons employed by the corporation, were entitled to bring suit under 28 U.S. C. § 1343(3) to secure the right to inspect public records which had been denied them by municipal authority; and in Watchtower Bible and Tract Society v. Los Angeles County, 9 Cir., 181 F.2d 739, it was held that the District Court had jurisdiction to entertain a complaint of a corporation engaged in the circulation of religious literature that it had been subjected to an unconstitutional tax. Both of these decisions relied upon the pronouncement of the Supreme Court in Grosjean v. American Press Co., supra, and we are in accord with their conclusions. It is true that the Fourteenth Amendment as well as the Civil Rights statutes were enacted for the purpose of securing colored persons against unjustifiable discrimination, but in the development of the law the protection afforded by the Amendment has not been confined to natural persons, and there is no reasonable ground at this time to deny the protection afforded by the Civil Rights Act to corporations which are engaged through their agents in public speech and in the circulation of literature designed to protect the rights of natural persons in whose interest the enactments were originally passed. In these days, when corporate organization is well-nigh necessary for the conduct of large enterprises, the propriety of including them within the protection of the Act would seem to be obvious; and since the word "person" in the Fourteenth Amendment has been broadly construed to include corporations in the protection of their property rights,[7] there is no good reason why the same liberality of interpretation should not be used when the corporation is formed not for purposes of profit but for the protection of the liberties of the individuals.

## JURISDICTIONAL AMOUNT

Secondly, the defendants contest the right of the plaintiffs to obtain relief in this court under 28 U.S.C. §§ 1331 and 1332 which confer upon the district courts jurisdiction over civil actions arising under the Constitution and laws of the United States and civil actions between citizens of different states, where the matter in controversy exceeds the sum of $3,000 exclusive of interest and costs. The contention is that the plaintiffs did not allege in their complaints or prove at the hearing sufficient facts to establish the jurisdictional amount. In substance the evidence shows that the membership of the Association in Virginia dropped from 19,436 for the first eight months of 1956, prior to the passage of the statutes in suit, to 13,595 in the first eight months of 1957, after the enactments. In the same period the income of the Association in Virginia showed a decline from $43,612.-75 to $37,470, and its national income a decline from $598,612.84 for the year 1956 to $425,608.13 for the first eight

7. See Pennekamp v. State of Florida, 328 U.S. 331, 66 S.Ct. 1029, 90 L.Ed. 1295 and Burstyn, Inc., v. Wilson, 343 U.S. 495, 72 S.Ct. 777, 96 L.Ed. 1098, in each of which the Court upheld the right of a business corporation to freedom of speech and freedom of the press. It seems illogical and meaningless to deny the same rights to a nonprofit corporation organized to protect the freedoms of natural persons since the latter may always be properly · joined as parties plaintiff in suits brought by the corporation on their behalf. See 66 Yale Law Journal 545, 548.

months of 1957. The Fund also experienced losses in these periods. Its income rose steadily until 1956, when it became $351,283.32 although its operations in Texas were restrained in September by an order of court. Its income dropped in the subsequent period, as is shown by contrasting its income of $180,000 for the first eight months of 1957 with its income of $246,000 for the same period of 1956. In Virginia, its income dropped from $1,859.20 for 1956 to $424 during the first eight months of 1957.

 When suit is brought for an injunction to restrain the enforcement of a regulatory statute alleged to be invalid because of its continuing harmful effect upon the plaintiff the jurisdiction of the court is to be tested by the value of the object to be gained. Failure to prove that a sufficient amount of damage has already been sustained will not defeat the remedy if the injury is recurrent or continuous, since the advantage to be gained by the complainant from removal of the burden imposed by the statute is the matter in controversy. Glenwood Light & Water Co. v. Mutual Light, Heat & Power Co., 239 U.S. 121, 125, 126, 36 S.Ct. 30, 60 L.Ed. 174; Gibbs v. Buck, 307 U.S. 66, 74, 59 S.Ct. 725, 83 L.Ed. 1111; American R. Co. of Porto Rico v. South Porto Rico Sugar Co., 1 Cir., 293 F. 670, 673; cf. McNutt v. General Motors Accept. Corp., 298 U.S. 178, 181, 56 S.Ct. 780, 80 L.Ed. 1135; KVOS, Inc., v. Associated Press, 299 U.S. 269, 277, 57 S.Ct. 197, 81 L.Ed. 183. Hence the inquiry in the pending suits is not limited to the immediate effect upon the plaintiffs to be expected from the enforcement of the Virginia statutes but extends to the loss likely to flow from their enforcement throughout the years. Nor is the inquiry limited to the impact of the statutes upon the plaintiffs' business in Virginia, because the registration statutes, Chapters 31 and 32, are not confined to business done in Virginia but require both plaintiffs to disclose the details of their business throughout the country including a list

of all members, all contributions, and all expenditures; and Chapters 33, 35 and 36, relating to the practice of law, forbid the plaintiffs to pay the costs and expenses of class suits to which most of the contributions received by the Fund in its recurrent national campaigns are devoted. Taking these facts into consideration, it is manifest that the existence of the required jurisdictional amount is established in each of the cases before the court.

Certainly it cannot be said that the claim of loss in excess of the jurisdictional amount was made by the plaintiffs in bad faith for the purpose of conferring jurisdiction, or that it has been shown to a legal certainty that less than the amount is involved in the pending suits; and hence the plaintiffs have met the test laid down in the following excerpt from St. Paul Mercury Indemnity Co. v. Red Cab Co., 303 U.S. 283, 288–290, 58 S.Ct. 586, 590, 82 L.Ed. 845:

"The intent of Congress drastically to restrict federal jurisdiction in controversies between citizens of different states has always been rigorously enforced by the courts. The rule governing dismissal for want of jurisdiction in cases brought in the federal court is that, unless the law gives a different rule, the sum claimed by the plaintiff controls if the claim is apparently made in good faith. It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal. The inability of plaintiff to recover an amount adequate to give the court jurisdiction does not show his bad faith or oust the jurisdiction. Nor does the fact that the complaint discloses the existence of a valid defense to the claim. But if, from the face of the pleadings, it is apparent, to a legal certainty, that the plaintiff cannot recover the amount claimed or if, from the proofs, the court is satisfied to a like certainty that the plaintiff never was entitled to recover that amount, and that his claim

was therefore colorable for the purpose of conferring jurisdiction, the suit will be dismissed. Events occurring subsequent to the institution of suit which reduce the amount recoverable below the statutory limit do not oust jurisdiction."

## RESTRAINT OF CRIMINAL PROSECUTION

The defendants also invoke the familiar rule that ordinarily a court of equity will not restrain a criminal prosecution based on a state statute, even if the constitutionality of the statute is involved, since this question can be raised and settled in the criminal case with review by the higher courts as well as in a suit for injunction, Douglas v. City of Jeannette (Pennsylvania), 319 U.S. 157, 163, 164, 63 S.Ct. 877, 87 L. Ed. 1324, and this is especially true where the only threatened action is a single prosecution of an alleged violation of state law. However, it is also well recognized that a criminal prosecution may be enjoined under exceptional circumstances where there is a clear showing of danger of immediate irreparable injury. Spielman Motor Sales Co. v. Dodge, 295 U.S. 89, 95, 55 S.Ct. 678, 79 L.Ed. 1322; Beal v. Missouri Pacific R. Corp., 312 U.S. 45, 49, 61 S.Ct. 418, 85 L.Ed. 577. It is obvious that the present case falls in the latter category. The penalties prescribed by the statutes are heavy and they are applicable not only to the corporation but to every person responsible for the management of its affairs, and under Chapter 32 of the statutes each day's failure to register and file the required information constitutes a separate punishable offense. The deterrent effect of the statutes upon the acquisition of members, and upon the activities of the lawyers of the plaintiffs under the threat of disciplinary action has already been noted, and the danger of immediate and persistent efforts on the part of the state authorities to interfere with the activities of the plaintiffs has been made manifest by the repeated public statements. The facts of the cases abundantly justify the exercise of the equitable powers of the court. Ex parte Young, 209 U.S. 123, 147, 28 S.Ct. 441, 52 L.Ed. 714; Truax v. Raich, 239 U.S. 33, 36 S.Ct. 7, 60 L.Ed. 131; Western Union Telegraph Co. v. Andrews, 216 U.S. 165, 30 S.Ct. 286, 54 L.Ed. 430; Sterling v. Constantin, 287 U.S. 378, 53 S.Ct. 190, 77 L.Ed. 375.

## PRIOR CONSTRUCTION OF STATUTES BY STATE SUPREME COURT

Finally, the defendants urge that we should not exercise the power to restrain the enforcement of the state statutes but should withhold action until the statutes have been construed by the Supreme Court of Appeals of Virginia. This contention is based on the policy defined in decisions of the Supreme Court of the United States that the federal courts should avoid passing on constitutional questions in situations where an authoritative interpretation of state law may avoid the constitutional issues. Hence if the interpretation of a state statute is doubtful or a question of law remains undecided, the federal court should hold its proceedings in abeyance for a reasonable time pending construction of the statute by the state courts or until efforts to obtain such an adjudication have been exhausted. See Spector Motor Service, Inc., v. McLaughlin, 323 U.S. 101, 65 S.Ct. 152, 89 L.Ed. 101; Government & Civic Employees Organizing Committee, C. I. O. v. Windsor, 347 U.S. 901, 74 S.Ct. 429, 98 L.Ed. 1061; and 353 U.S. 364, 77 S.Ct. 838, 1 L.Ed.2d 894; Shipman v. Dupre, 339 U.S. 321, 70 S.Ct. 640, 94 L.Ed. 877.

These rulings, however, do not mean that the federal courts lose jurisdiction in cases where the state courts have not passed upon the statute under attack or that the federal court is powerless to take any action until a decision by the state court has been rendered. Such a conclusion could not be reached in the pending case since the federal statutes expressly confer jurisdiction upon the federal courts where civil rights have been violated (42 U.S.C. § 1983), or

where federal questions are involved (28 U.S.C. § 1331). Thus in Doud v. Hodge, 350 U.S. 485, 76 S.Ct. 491, 100 L.Ed. 577, where the constitutionality of a licensing and regulatory statute was involved and jurisdiction of the federal court was invoked under 28 U.S.C. § 1331, the Court said (350 U.S. at page 487, 76 S.Ct. at page 492):

" \* \* \* This Court has never held that a district court is without jurisdiction to entertain a prayer for an injunction restraining the enforcement of a state statute on grounds of alleged repugnancy to the Federal Constitution simply because the state courts had not yet rendered a clear or definitive decision as to the meaning or federal constitutionality of the statute.

"We hold that the District Court has jurisdiction of this cause. It was error to dismiss the complaint for lack of jurisdiction. The judgment of the District Court is vacated and the case is remanded to it. We do not decide what procedures the District Court should follow on remand."

See also A. F. of L. v. Watson, 327 U.S. 582, 599, 66 S.Ct. 761, 90 L.Ed. 873, where, in directing a district court to retain a suit involving the constitutionality of a state statute pending the determination of proceedings in the state courts, the Supreme Court said that the purpose of the suit in the federal court would not be defeated by this action, since the resources of equity are adequate to deal with the problem so as to avoid unnecessary friction with state policies while cases go forward in the state courts for an expeditious adjudication of state law questions.

▬ The policy laid down by the Supreme Court does not require a stay of proceedings in the federal courts in cases of this sort if the state statutes at issue are free of doubt or ambiguity. See the opinion of Judge Parker in Bryan v. Austin, D.C.E.D.S.C., 148 F. Supp. 563, 567–568, where it was said:

"I recognize, of course, that, in the application of the rule of comity, a federal court should stay action pending action by the courts of a state, where it is called upon to enjoin the enforcement of a state statute which has not been interpreted by the state courts, and where the statute is susceptible of an interpretation which would avoid constitutional invalidity. As the federal courts are bound by the interpretation placed by the highest court of a state upon a statute of that state, they should not enjoin the enforcement of a statute as violative of the Constitution in advance of such an interpretation, if it is reasonably possible for the statute to be given an interpretation which will render it constitutional. \* \* \* The rule as to stay of proceedings pending interpretation of a state statute by the courts of the state can have no application to a case, such as we have here, where the meaning of the statute is perfectly clear and where no interpretation which could possibly be placed upon it by the Supreme Court of the state could render it constitutional."

We are not unmindful of the necessity of maintaining the delicate balance between state and federal courts under the concept of separate sovereigns. We agree that the constitutionality of state statutes requiring special competence in the interpretation of local law should not be determined by federal courts in advance of a reasonable opportunity afforded the parties to seek an adjudication by the state court. With these basic principles we find no fault.

It must be remembered, however, that Congress has not seen fit to restrict the jurisdiction of the district courts by imposing as a condition precedent to action by the federal courts, the judicial pronouncement by the state court in cases where the constitutionality of a state statute is presented and injunctive relief is requested. Concurrent juris-

diction still exists until modified in the wisdom of the legislative branch of our government.

Neither are we given any clear formula to follow under the decisions of the Supreme Court. The more recent decisions of the highest court suggest that statutory three-judge courts should be hesitant in exercising jurisdiction in the absence of state court action, or at least a reasonable opportunity to secure same. It is apparent to us that the Supreme Court has endeavored to grant cautious discretion to district courts in determining whether jurisdiction should be exercised and the matter considered on its merits, as contrasted with the acceptance of jurisdiction as such. Should this court exercise such jurisdiction under the facts and circumstances of this case, bearing in mind the importance of the questions presented?

We are advised that Virginia is not alone in enacting legislation seriously impeding the activities of the plaintiff corporations through the passage of similar laws (43 Va.L.Rev. 1241). As heretofore noted, the problem for determination is essentially a federal question with no peculiarities of local law. Where the statute is free from ambiguity and there remains no reasonable interpretation which will render it constitutional, there are compelling reasons

to bring about an expeditious and final ascertainment of the constitutionality of these statutes to the end that a multiplicity of similar actions may, if possible, be avoided.

## CONSTITUTIONALITY OF CHAPTERS 31 AND 32

This discussion brings us at last to a consideration of the attack made on the constitutionality of the statutes in their bearing upon the activities of the plaintiffs. The two registration statutes, Chapters 31 and 32, are free from ambiguities which require a prior interpretation by the courts of the state and hence the obligation to pass on the question of constitutionality cannot be avoided.

Chapter 32 is the more sweeping of the two. Section 1 declares that harmonious relations between the races are essential to the welfare, health and safety of the people of Virginia and that it is the duty of the government to exercise all available means to prevent conditions which impede the peaceful coexistence of all the peoples in the state, and that therefore it is vital to the public interest that information be obtained with respect to persons or corporations whose activities may cause interracial tension or unrest.

Section 2 [8] of Chapter 32 requires the registration of any person who in con-

8. "§ 2. Every person, firm, partnership, corporation or association, whether by or through its agents, servants, employees, officers, or voluntary workers or associates, who or which engages as one of its principal functions or activities in the promoting or opposing in any manner the passage of legislation by the General Assembly in behalf of any race or color, or who or which has as one of its principal functions or activities the advocating of racial integration or segregation or whose activities cause or tend to cause racial conflicts or violence, or who or which is engaged or engages in raising or expending funds for the employment of counsel or payment of costs in connection with litigation in behalf of any race or color, in this State, shall, within sixty days after the effective date of this act and annually within sixty days following the first of each year thereafter,

cause his or its name to be registered with the clerk of the State Corporation Commission, as hereinafter provided; provided that in the case of any person, firm, partnership, corporation, association or organization, whose activities have not been of such nature as to require it to register under this act, such person, firm, partnership, corporation, association or organization, within sixty days following the date on which he or it engages in any activity making registration under this act applicable, shall cause his or its name to be registered with the clerk of the State Corporation Commission, as hereinafter provided; and provided, further, that nothing herein shall apply to the right of the people peaceably to assemble and to petition the government for a redress of grievances, or to an individual freely speaking or publishing on his own behalf in the

cert with others engages as one of his principal activities (1) in promoting or opposing in any manner the passage of legislation by the General Assembly, in behalf of any race or color, or (2) in advocating racial integration or segregation; and the statute also requires the registration of any person, (3) whose activities cause or tend to cause racial conflict or violence, or (4) who is engaged in raising or expending funds for the employment of counsel or the payment of costs in connection with racial litigation.

The Association is admittedly engaged in activities (1), (2) and (4) and the defendants have offered evidence tending to show that these activities, if successful in bringing about integration, would cause racial conflicts and violence. The Fund is engaged in activities (2) and (4).

The sort of registration required by Chapter 32 has a definite bearing upon the validity of the enactment, since a statement of the business of the registrant in much detail is prescribed. The registrant, if a corporation, is required by § 3 of the statute to file a statement showing amongst other things the business address of all of its offices, the purpose for which it was formed, a copy of its charter, the names of its principal officers, and the names and addresses of all of the persons through whom it carries on its activities in the state, a list of its members and their addresses, a financial statement of assets and liabilities, an itemized list of its contributions and other income during the preceding year, and a list of its expenditures in detail.

Section 3 provides that, at the time of registration, information as to the pre-

ceding year shall be furnished under oath as to the source of any funds received or expended for the purposes set forth in § 2, including the name and address of each contributor and an itemized statement of expenditures, and also, if the registrant is a corporation, a list of its members in the state and their addresses and a financial statement showing the assets and liabilities, the source of its income, itemizing contributions and the sources thereof, and a list of expenditures in detail.

Section 5 makes it a misdemeanor for any person to engage in the activities described in § 2 without registration, punishable, in the case of a corporation, by a fine not exceeding $10,000, each day's failure to register constituting a separate offense and punishable as such.

Section 6 provides that any person failing to comply with the Act may be enjoined from continuing its activities by any court of competent jurisdiction.

Section 9 excepts from the Act newspapers, periodicals, magazines or other like means admitted as second class matter in the United States Post Office, as well as radio, television, facsimile broadcast or wire service operations. Also excepted are persons or associations in a political election campaign or persons acting together because of activities connected with political campaigns.

Undoubtedly the burden of supplying these statements imposed upon persons who engage in activities (1) and (2) constitutes a restriction upon the right of free speech which, as we have seen, the Association is entitled to exercise. Hence the question arises whether the statute is within the police powers which, in the past, have been properly exercised in many fields.[9] The defendants point

expression of his opinion and engaging in no other activity subject to the provisions hereof and not acting in concert with other persons."

9. Among the authorities cited by the defendants were cases upholding regulation by registration applicable to vocational activities (United States v. Harriss, 1954, 347 U.S. 612, 74 S.Ct. 808,

98 L.Ed. 989, and United States v. Slaughter, D.C.1950, 89 F.Supp. 205, on lobbyists; Viereck v. United States, 1943, 318 U.S. 236, 63 S.Ct. 561, 87 L.Ed. 734, and United States v. Peace Information Center, D.C.1951, 97 F.Supp. 255, on foreign agents), suversion (Communist Party of United States v. Subversive Activities Control Board, 1954, 96 U.S.App. D.C. 66, 223 F.2d 531, and Albertson v.

out that the promoting or opposing passage of legislation covered by clause (1) may involve lobbying, which has long been recognized as a proper subject of regulation by the state and federal governments. Thus it was decided in United States v. Harriss, 347 U.S. 612, 74 S.Ct. 808, 98 L.Ed. 989, by a divided court, that the registration provisions of the Federal Regulation of Lobbying Act, 2 U.S.C.A. § 261 et seq. did not violate freedom of speech, provided the scope of the Act was limited to persons who had solicited or received contributions to influence or defeat the passage of legislation and who intended to accomplish this purpose through direct communication with members of Congress. The plain implication of the decision, as appears clearly from the dissenting opinions, is that unless the Act were so limited it would be an unwarranted interference with the right of free speech. The lobbying statute of the State of Virginia, §§ 30–20 to 30–28, is likewise limited to those who employ a person to promote or oppose the passage of an act of the General Assembly and to a person accepting such employment. Such a person is required to register his name upon a legislative docket.

 The terms of clause (1) of § 2 of the Act contain no such limitation. They apply to any person whose principal activities include "the promoting or opposing *in any manner* the passage of legislation by the General Assembly," [emphasis added] excepting however, by § 9 of the Act, newspapers and similar publications, communications by radio and television, and persons engaged in a political election campaign. Hence the duty to register is imposed upon anyone who in concert with others merely speaks or writes on the subject, even if he has had no contact of any kind with the legislative body and has neither received nor spent any money to further his purpose. The discriminating and oppressive character of the provision is emphasized by the exemption of persons engaged in a political election campaign who are free to speak without registration, whereas, persons having no direct interest in elections as such and concerned only with securing equal rights for all persons are covered by the statute. Manifestly so broad a restriction cannot be held valid under the ruling of United States v. Harriss, supra.

 The terms of clause (2) impinge directly upon the field of free speech for they apply to anyone, with the same exceptions, whose present activities include "the advocating of racial integration or segregation," and so the same problem of the extent of regulatory power is presented. It must be borne in mind in considering the question that the prohibition against laws abridging the freedom of speech, press and assembly contained in the First Amendment is not absolute, for, as was said in American Communications Ass'n, C. I. O. v. Douds, 339 U.S. 382, 394, 70 S.Ct. 674, 682, 94 L.Ed. 925, "it has long been established that those freedoms themselves are dependent upon the power of constitutional government to survive." Consequently in that case the non-Communist affidavits required by the Labor Management Relations Act, 29 U.S.C.A. § 141 et seq. were upheld even though the situation did not meet the clear and present danger test laid down in Schenck v. United States, 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470; and in Dennis v. United States, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137, the clear and present danger test was applied in upholding a conviction under the Smith Act, 18 U.S.C.A. § 2385, which made it a crime to organize a group which knowingly and

Millard, D.C.1952, 106 F.Supp. 635), and presidential election activities (Burroughs v. United States, 1934, 290 U.S. 534, 54 S.Ct. 287, 78 L.Ed. 484). Cases involving Congressional control of the second class mailing privilege (Lewis Publishing Co. v. Morgan, 1913, 229 U.S. 288, 33 S.Ct. 867, 57 L.Ed. 1190), and state control over fraternities in state schools (Waugh v. Board of Trustees of University of Mississippi, 1915, 237 U.S. 589, 35 S.Ct. 720, 59 L.Ed. 1131, and Webb v. State University of New York, D.C.1954, 125 F.Supp. 910) are also cited.

wilfully advocates the violent overthrow of the Government of the United States.

The defendants insist that Chapter 32 was enacted for the commendable purpose of protecting the public welfare and safety and therefore should be upheld. They point to the declaration of the policy in the preamble of the statute to eliminate all conditions which impede the peaceful co-existence of all persons in the state and which, according to the testimony of law enforcement officers, is threatened by the effort to establish integration of the races in the public schools. Great dependence is placed upon the decision of the Supreme Court in People of State of New York ex rel. Bryant v. Zimmerman, 1928, 278 U.S. 63, 49 S.Ct. 61, 73 L.Ed. 184, which is described as the leading case in this field most pertinent to the matter now before the court. The Supreme Court upheld a New York statute, Civil Rights Law, McKinney's Consol.Laws, c. 6, §§ 53, 56, aimed at the activities of the Ku Klux Klan, which required associations having an oath-bound membership to file lists of their members and officers with a State officer and made it a crime for members to attend meetings knowing that the registration requirement had not been complied with. It was held that the statute as applied to a member of the Ku Klux Klan would not violate the due process clause of the Fourteenth Amendment since the state, for its own protection, was entitled to the disclosure as a deterrent to violations of the law; and also that there was no denial of equal protection in excepting labor unions, Masons and other fraternal bodies from the statutes, since there was a tendency on the part of the Ku Klux Klan to shroud its acts in secrecy and engage in conduct inimical to the public welfare.

We do not think that these decisions justify the restriction upon public discussion which Chapter 32 imposes upon the plaintiffs in this case. Obviously the purpose and effect of a regulatory act must be examined in each case in light of the existing situation. In the present instance the executive and legislative officers of the state have publicly and forcibly announced their determination to impede and, if possible, to prevent the integration of the races by all lawful means; and the statutes passed at the Extra Session were clearly designed to cripple the agencies that have had the greatest success in promoting the rights of colored persons to equality of treatment in the past, and are possessed of sufficient resources to make an effort at this time to secure the enforcement of the Supreme Court's decree. The statute is not aimed, as the act considered in People of State of New York ex rel. Bryant v. Zimmerman, at curbing the activities of an association likely to engage in violations of the law, but at bodies who are endeavoring to abide by and enforce the law and have not themselves engaged in acts of violence or disturbance of the public peace.

The Act is not saved, in so far as the defendants are concerned, by making it applicable to advocates of both sides of the dispute so that it requires a disclosure of the names of persons who may be led to acts of violence by reason of their hostility to integration. Such a provision does not lead to equality of treatment under the circumstances known by the Legislature to prevail. Registration of persons engaged in a popular cause imposes no hardship while, as the evidence in this case shows, registration of names of persons who resist the popular will would lead not only to expressions of ill will and hostility but to the loss of members by the plaintiff Association.

Nor can the statute be sustained on the ground that breaches of peace may occur if integration in the public schools is enforced. The same contention was made in Buchanan v. Warley, 245 U.S. 60, 38 S.Ct. 16, 62 L.Ed. 149, where the court struck down an ordinance of the City of Louisville which forbade colored persons to occupy houses in blocks occupied for the most part by white persons. The court rejected the contention that the prohibition should be sustained

on the ground that it served to diminish miscegenation and to promote the public peace by averting race hostility. See 245 U.S. pages 73–74, 38 S.Ct. page 18:

"This drastic measure is sought to be justified under the authority of the state in the exercise of the police power. It is said such legislation tends to promote the public peace by preventing racial conflicts; that it tends to maintain racial purity; that it prevents the deterioration of property owned and occupied by white people, which deterioration, it is contended, is sure to follow the occupancy of adjacent premises by persons of color.

"The authority of the state to pass laws in the exercise of the police power, having for their object the promotion of the public health, safety and welfare is very broad as has been affirmed in numerous and recent decisions of this court. Furthermore, the exercise of this power, embracing nearly all legislation of a local character, is not to be interfered with by the courts where it is within the scope of legislative authority and the means adopted reasonably tend to accomplish a lawful purpose. But it is equally well established that the police power, broad as it is, cannot justify the passage of a law or ordinance which runs counter to the limitations of the federal Constitution; that principle has been so frequently affirmed in this court that we need not stop to cite the cases."

This comment strikes home with peculiar force to the situation in Virginia where the attitude of the public authorities openly encourages opposition to the law of the land, which may easily find expression in disturbances of the public peace. That which was said in Grosjean v. American Press Co., 297 U.S. 233, 250, 56 S.Ct. 444, 449, 80 L.Ed. 660, in respect to a state license tax imposed on the owners of newspapers is pertinent here:

" * * * the tax here involved is bad not because it takes money from the pockets of the appellees. If that were all, a wholly different question would be presented. It is bad because, in the light of its history and of its present setting, it is seen to be a deliberate and calculated device in the guise of a tax to limit the circulation of information to which the public is entitled in virtue of the constitutional guaranties. A free press stands as one of the great interpreters between the government and the people. To allow it to be fettered is to fetter ourselves."

For our purpose it is of special significance that in Thomas v. Collins, 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430, the Supreme Court held invalid a statute which required a union organizer merely to register and secure an organizer's card from a state officer before soliciting membership in a labor union in a public speech. It was said "that as a matter of principle a requirement of registration in order to make a public speech would seem generally incompatible with the exercise of free speech and free assembly". The greater burden of the registration statutes in suit is manifest.

The terms of clause (3) of § 2 of the statute requiring registration of anyone whose activities cause or tend to cause racial conflicts or violence require little discussion. They are so vague and indefinite that the clause taken by itself does not satisfy the constitutional requirement that a criminal statute must give to a person of ordinary intelligence fair notice of the kind of conduct that constitutes the crime, United States v. Harriss, 347 U.S. 612, 74 S.Ct. 808, 98 L.Ed. 989.

Clause (4) of Chapter 32 requires the registration of anyone who engages in raising or expending funds for the employment of counsel or the payment of costs in connection with litigation on behalf of any race or color. In connection with other provisions contained in Chapters 31, 33, 35 and 36 relating to litiga-

tion, it constitutes an important part, perhaps the most important part, of the plan devised by the state authorities to impede or to prevent the integration of the races in the schools of the state; and it subjects the participant to all of the details of registration above described.

In its broad coverage the statute applies to any individual who employs and pays a lawyer to act for him in a lawsuit involving a racial question. It also covers the plaintiff corporations in their effort to raise the money which in the past has been used to assist the colored people in the prosecution of suits to secure their constitutional rights both before and after the decision in Brown v. Board of Education.[10]

The right of access to the courts is one of the great safeguards of the liberties of the people and its denial or undue restriction is a violation of the due process clauses of the Fifth and Fourteenth Amendments. That the restriction is onerous in this instance cannot be denied, for it is not confined to identification of the collectors of the funds but requires the disclosure of every contributor and of every member of the

Association whose annual dues may have been used in part to pay the expenses of litigation.

Undoubtedly a state may protect its citizens from fraudulent solicitation of funds by requiring a collector to establish his identity and his authority to act; and the state may also regulate the time and manner of the solicitation in the interest of public safety and convenience. Cantwell v. State of Connecticut, 310 U.S. 296, 306, 60 S.Ct. 900, 84 L.Ed. 1213; Thomas v. Collins, 323 U.S. 516, 540, 65 S.Ct. 315, 89 L.Ed. 430. Corrupt Practices Acts which seek to preserve the purity of elections by requiring the disclosure of the identity of those who strive to influence the choice of public officials are also a proper subject of legislative regulation. Burroughs v. United States, 290 U.S. 534, 54 S.Ct. 287, 78 L.Ed. 484. The statute before us, however, presents a very different case. It requires not merely the identity of the collector of the funds but the disclosure of the name of every contributor. In effect, as applied to this case, it requires every person who desires to become a member of the Association and to exer-

10. The reported cases from both federal and state courts in this Circuit in which the Association or the Fund has taken an active part include: Dawson v. Mayor and City Council of Baltimore City (Lonesome v. Maxwell), 4 Cir., 220 F.2d 386, affirmed mem. 350 U.S. 877, 76 S. Ct. 133, 100 L.Ed. 774, and Department of Conservation and Development, Division of Parks, Com. of Va. v. Tate, 4 Cir., 231 F.2d 615, certiorari denied 352 U.S. 838, 77 S.Ct. 58, 1 L.Ed.2d 56, dealing with segregation at Maryland public beaches and Virginia public parks; Morgan v. Commonwealth, 184 Va. 24, 34 S.E.2d 491, reversed 328 U.S. 373, 66 S.Ct. 1050, 90 L.Ed. 1317, and Fleming v. South Carolina Elec. & Gas Co., 4 Cir., 224 F.2d 752, and, 4 Cir., 239 F.2d 277, concerning segregation in bus transporation; Alston v. School Board of City of Norfolk, 4 Cir., 112 F.2d 992, 130 A.L.R. 1506, certiorari denied 311 U.S. 693, 61 S.Ct. 75, 85 L.Ed. 448, dealing with discriminatory fixing of school teachers' salaries; University of Maryland v. Murray, 169 Md. 478, 182 A. 590, 103 A.L.R. 706, and Kerr v. Enoch Pratt Free Library of Baltimore City, 4 Cir.,

149 F.2d 212, certiorari denied 326 U.S. 721, 66 S.Ct. 26, 90 L.Ed. 427, concerning racial discrimination in professional school admissions; Briggs v. Elliott, D.C., 103 F.Supp. 920, reversed 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, remanded 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083, decree entered, D.C., 132 F.Supp. 776; Davis v. County School Board of Prince Edward County, D.C., 103 F.Supp. 337, reversed 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, remanded 349 U.S. 294, 75 S. Ct. 753, 99 L.Ed. 1083, decree entered sub nom.; Davis v. County School Board of Prince Edward County, D.C., 149 F. Supp. 431, reversed Allen v. County School Board of Prince Edward County, 4 Cir., 249 F.2d 462; School Board of City of Charlottesville, Va. v. Allen (County School Board of Arlington County, Va. v. Thompson), 4 Cir., 240 F.2d 59; School Board of City of Newport News, Va. v. Atkins (School Board of City of Norfolk, Va. v. Beckett), 4 Cir., 246 F.2d 325, certiorari denied 355 U.S. 855, 78 S.Ct. 83, 2 L.Ed.2d 63, and Moore v. Board of Education of Harford County, Md., 152 F. Supp. 114, relating to segregation in the public schools.

cise with it the rights of free speech and free assembly to be registered, and the size of his contribution to be shown. This seems to us far more onerous than the requirement of a license to speak, which was struck down as unconstitutional in Thomas v. Collins, supra, especially as in this instance the disclosure is prescribed as part of a deliberate plan to impede the contributors in the assertion of their constitutional rights. In our opinion all four clauses of § 2 as applied to the plaintiffs in this case are unconstitutional.

In reaching this conclusion we may fairly consider not only the rights of the plaintiff corporations but also the rights of the individuals for whom they speak, particularly the rights of the members of the Association and generally the members of the colored race in whose interests the plaintiffs carry on their work. The rights that the plaintiffs assert take their color and substance from the rights of their constituents; and it is now held that where there is need to protect fundamental constitutional rights the rule of practice is relaxed, which confines a party to the assertion of his own rights as distinguished from the rights of others. See Barrows v. Jackson, 346 U.S. 249, 257, 73 S.Ct. 1031, 97 L.Ed. 1586. This rule was applied in Brewer v. Hoxie School District, 8 Cir., 238 F.2d 91, 104, where the school board in an Arkansas county brought suit to restrain certain organizations from obstructing the board in its efforts to secure the equal protection of the laws to all persons in the operation of the public schools in the district. The court said:

"The school board having the duty to afford the children the equal protection of the law has the correlative right, as has been pointed out, to protection in performance of its function. Its right is thus intimately identified with the right of the children themselves. The right does not arise solely from the interest of the parties concerned, but from the necessity of the government itself. * * * Though, generally speaking, the right to equal protection is a personal right of individuals, this is 'only a rule of practice', * * * which will not be followed where the identity of interest between the party asserting the right and the party in whose favor the right directly exists is sufficiently close."

For like reasons Chapter 31, which covers much the same ground as clause (4) of § 2 of Chapter 32, must also be held invalid. The introductory paragraph of § 2 is as follows:

"No person shall engage in the solicitation of funds from the public or any segment thereof when such funds will be used in whole or in part to commence or to prosecute further any original proceedings, unless such person is a party or unless he has a pecuniary right or liability therein, nor shall any person expend funds from whatever source received to commence or to prosecute further any original proceedings, unless such person is a party or has a pecuniary right or liability therein, until any person shall first:"—and then follows

Section 2(1) which requires the corporation to file annually a copy of its charter, a certified list of its officers and directors and members, a statement showing the source of each contribution or other item of revenue received during the preceding year and, if required by the State Corporation Commission, the name and address of each contributor; also a statement showing in detail the expenditures during the preceding year and any other information required by the State Corporation Commission.

Section 3 makes a violation of the Act a misdemeanor punishable by fine of not more than $10,000 and the denial of admission to do business in the state. Violations of the Act may be enjoined in any court of record having civil jurisdiction. Every director and officer of the corporation and every person responsible for the management of its affairs is personally liable for the payment of the fine.

Further consideration of the restrictions imposed upon litigation on behalf of the colored race by the Virginia plan will be found in the following discussion in respect to Chapters 33, 35 and 36 also passed at the Extra Session of 1956.

## CHAPTER 35

Chapters 33, 35 and 36 all relate to the improper practice of law. They are of prime importance since they furnish the basis for the contention of the prosecuting officers of the state that the plaintiff corporations are unlawfully engaged in the practice of law in Virginia and hence are not entitled to maintain these suits. Chapters 35 and 36, and the amendment of the sections of the Virginia Code relating to the illegal practice of law contained in Chapter 33, are new in the statute law of the state and are essential parts of the plan which deprives the colored people of the state of the assistance of the Association and the Fund in the assertion of their constitutional rights. To this end each of the statutes contains provisions which would bar the Association and the Fund from continuing to give the kind of assistance to colored plaintiffs in racial litigation which they have rendered for many years in the past.

We consider first Chapter 35 since it contains a carefully phrased definition of the crime of barratry and is free from ambiguity. Barratry is defined in § 1 as stirring up litigation; a barrator is one who stirs up litigation; and stirring up litigation means instigating a person to institute a suit at law or equity. The terms "instigating," "justified" and "direct interest" are defined in §§ 1(d), (e) and (f) as follows:

"(d) 'Instigating' means bringing it about that all or part of the expenses of the litigation are paid by the barrator or by a person or persons (other than the plaintiffs) acting in concert with the barrator, unless the instigation is justified.

"(e) 'Justified' means that the instigator is related by blood or marriage to the plaintiff whom he insti-gates, or that the instigator is entitled by law to share with the plaintiff in money or property that is the subject of the litigation or that the instigator has a direct interest in the subject matter of the litigation or occupies a position of trust in relation to the plaintiff; or that the instigator is acting on behalf of a duly constituted legal aid society approved by the Virginia State Bar which offers advice or assistance in all kinds of legal matters to all members of the public who come to it for advice or assistance and are unable because of poverty to pay legal fees.

"(f) 'Direct interest' means a personal right or a pecuniary right or liability."

The Legislature was careful to make exception of certain special situations and class suits in the following language:

"This act shall not be applicable to attorneys who are parties to contingent fee contracts with their clients where the attorney does not protect the client from payment of the costs and expense of litigation, nor shall this act apply to any matter involving annexation, zoning, bond issues, or the holding or results of any election or referendum, nor shall this act apply to suits pertaining to or affecting possession of or title to real or personal property, regardless of ownership, nor shall this act apply to suits involving the legality of assessment or collection of taxes or the rates thereof, nor shall this act apply to suits involving rates or charges or services by common carriers or public utilities, nor shall this act apply to criminal prosecutions, nor to the payment of attorneys by legal aid societies approved by the Virginia State Bar, nor to proceedings to abate nuisances. Nothing herein shall be construed to be in derogation of the constitutional rights of real parties in interest to employ counsel or to prosecute any available legal remedy under the laws of this State."

The reference to the Virginia State Bar in §§ 1(e) and (f) is explained by the terms of Chapter 47, also passed at the Extra Session, which authorized the State Bar through its governing body to promulgate rules and regulations governing the function and operation of legal aid societies, and empowered the Attorney General to enforce such rules and regulations if authorized to do so by the State Bar. The record in this case does not show whether the State Bar has taken action under the statute, but for present purposes this is not important since § 1(e) of Chapter 35 limits the regulatory power of the State Bar to legal aid societies which offer advice or assistance in all kinds of legal matters to all members of the public who come to it for advice and assistance and are unable because of poverty to pay legal fees. Organizations such as the Association and the Fund, which offer advice and assistance to a limited class of persons only, could not claim that they were "justified", even if they should have been approved by the State Bar.

Sections 2 and 3 make it a misdemeanor to engage in barratry punishable, if the barrator is a foreign corporation, by a fine of not more than $10,000 and the revocation of its certificate of authority to do business in the state; and § 6 declares that an attorney at law who violates the Act is guilty of unprofessional conduct and that his license to practice law shall be revoked after hearing (under § 54–74 of the Code) for such period as the court may determine.

Obviously the plaintiff corporations will be amenable to these penalties if they continue to pay any part of the expenses of racial litigation in Virginia since they would not be "justified" within the terms of § 1(e) of the Act; and attorneys at law connected with the plaintiff corporations who prosecute suits for colored persons, when authorized by them to do so, would also be liable to punishment if they assist, as they have done in the past, in bringing it about that any part of the expenses of litigation are paid by the Association or by the Fund.

The broad question is therefore raised as to whether it is within the power of the state to make it a crime for any corporation other than a general legal aid society to pay in whole or in part the expenses of litigation if it has only a general philanthropic or charitable interest in the litigation and does not have the kind of special interest described in the statute. Specifically, as applied to the facts of this case, the question is whether Virginia may make it a crime for organizations interested in the preservation of civil rights to contribute money for the prosecution of law suits instituted to promote this cause.

The right of the state to require high standards of qualification for those who desire to practice law within its borders and to revoke or suspend the license to practice law of attorneys who have been guilty of unethical conduct is unquestioned. Schware v. Board of Bar Examiners, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796; Richmond Ass'n of Credit Men v. Bar Association, 167 Va. 327, 189 S.E. 153; Campbell v. Third Dist. Committee, 179 Va. 244, 18 S.E.2d 883. Solicitation of business by an attorney is regarded as unethical conduct and a proper subject of disciplinary action; and it has been held that the state may prohibit a layman engaged in the business of collecting accounts from soliciting employment for this purpose, since a regulation which aims to bring the conduct of the business in harmony with the ethical practices of the legal profession is reasonable. McCloskey v. Tobin, 252 U.S. 107, 40 S.Ct. 306, 64 L.Ed. 481. Independent of statute, it is contrary to public policy for a corporation to practice law, directly or indirectly, since the relationship of attorney and client is one involving the highest trust and confidence and cannot exist between an attorney employed by the corporation and a client of the corporation; and so in Richmond Ass'n of Credit Men v. Bar Association, supra, it was held that a credit association was engaged in the unlawful practice of law when, acting with the authority of creditors, it selected and paid the lawyers who

were employed to make the collection by suit or otherwise.

The standards of the legal profession in these respects are carefully set forth in Canon 28 of the Canons of Professional Ethics of the American Bar Association, which condemns the stirring up of strife and litigation and declares it unprofessional for a lawyer to volunteer advice to bring a law suit except in cases where ties of blood, relationship or trust make it his duty to do so. It is declared to be disreputable to engage in such acts as hunting up defects in titles or seeking claims for personal injuries, or employing agents or runners for like purposes.

It is manifest, however, that the activities of the plaintiff corporations are not undertaken for profit or for the promotion of ordinary business purposes but, rather, for the securing of the rights of citizens without any possibility of financial gain. Its activities are not covered by Canon 28 but rather by Canon 35 entitled *Intermediaries,* which relates *inter alia* to the aid rendered to indigent litigants by charitable societies and provides in part as follows:

> "The professional services of a lawyer should not be controlled or exploited by any lay agency, personal or corporate, which intervenes between client and lawyer. A lawyer's responsibilities and qualifications are individual. He should avoid all relations which direct the performance of his duties by or in the interest of such intermediary. A lawyer's relation to his client should be personal, and the responsibility should be direct to the client. Charitable societies rendering aid to the indigents are not deemed such intermediaries."

Canon 35 was cited with approval in Richmond Ass'n of Credit Men v. Bar Association, 167 Va. at page 339, 189 S.E. at page 159. Indeed the exclusion of lawyers when acting for benevolent purposes and charitable societies, as distinguished from business corporations, from the restrictions imposed by the canons of Professional Ethics has long been recognized in the approval given by the courts to services voluntarily offered by members of the bar to persons in need, even when the attorneys have been selected by corporations organized to serve a cause in a controversial field. See the historic incidents listed in the opinion In re Ades, D.C.Md., 6 F.Supp. 467, 475; and see also Gunnels v. Atlanta Bar Ass'n, 191 Ga. 366, 12 S.E.2d 602, 132 A.L.R. 1165, where the Supreme Court of Georgia refused an injunction to restrain the bar association and its members from offering their services to borrowers of money as usurious rates in defense of suits that might be brought against them. The Court said in 191 Ga. at page 382, 12 S.E.2d at page 610:

> "It is not wrongful to induce a repudiation of an illegal contract. * * * Nor was the defendant's offer to represent free of charge persons caught in the toils of the usurious moneylender in defending against such illegal exactions, and to represent them in bringing actions to recover amounts illegally paid under loan contract a violation of the Code, * * * in reference to the solicitation of legal employment and the offense of barratry. We do not believe that it is true, as contended by counsel for the plaintiff, that the enforcement of the usury laws of this State is a matter solely for the law enforcement officers and of those from whom usury is being exacted, and that it is illegal and unethical for lawyers to publicly criticize an alleged widespread violation of such laws and to seek to eradicate the evil by the means here shown. Much could be said as to why their position in the community makes it entirely appropriate that they undertake such a movement and assume such responsibilities in reference to the general welfare of the public. We see no reason why the judgment of the learned judge should be disturbed."

Chapter 35, in failing to recognize this settled rule, violates well-established constitutional principles in its bearing upon the plaintiff corporations. "A State can-

not exclude a person from the practice of law or from any other occupation in a manner or for reasons that contravene the Due Process or Equal Protection Clause of the Fourteenth Amendment", Schware v. Board of Bar Examiners, 353 U.S. 232, 238, 77 S.Ct. 752, 756, 1 L.Ed. 2d 796. In the first place, the statute obviously violates the equal protection clause, for it forbids the plaintiffs to defray the expenses of racial litigation, while at the same time it legalizes the activities of legal aid societies that serve all needy persons in all sorts of litigation. No argument has been offered to the court to sustain this discrimination. Moreover, Chapter 35 violates the due process clause, for it is designed to put the plaintiff corporations out of business by forbidding them to encourage and assist colored persons to assert rights established by the decisions of the Supreme Court of the United States. The activities of the plaintiffs as they appear in these cases do not amount to a solicitation of business or a stirring up of litigation of the sort condemned by the ethical standards of the legal profession. They comprise in substance public instruction of the colored people as to the extent of their rights, recommendation that appeals be made to the courts for relief, offer of assistance in prosecuting the cases when assistance is asked, and the payment of legal expenses for people unable to defend themselves; and the attorneys who have done the work have done so only when authorized by the plaintiffs. The evidence is uncontradicted that the initial steps which have led to the institution and prosecution of racial suits in Virginia with the assistance of the Association and the Fund have not been taken until the prospective plaintiffs made application to one or the other of the corporations for help. In our opinion the right of the plaintiff corporations to render this assistance cannot be denied.

No doubt, the State of Virginia has the right reasonably to regulate the practice of law, but, where that regulation prohibits otherwise lawful activities without showing any rational connection between the prohibition and some permissible end of legislative accomplishment, the regulation fails to satisfy the requirements of due process of law. Here, under the guise of regulating unauthorized law practice, the General Assembly has forbidden plaintiffs to continue their legal operations.

Chapters 33 and 36 are also phrased so as to interfere with the activities of the plaintiffs. This is done in Chapter 33 by amending §§ 54–74, 54–78 and 54–79 of Article 7 of the Code relating to malpractice and to the improper solicitation of legal business for an attorney by a "runner" or "capper", so as to include within the definition of these terms a person who employs an attorney in connection with any judicial proceeding in which the person has no pecuniary right or liability. The language of the statute, especially portions of § 54–74(6) and § 54–78(1),[11] is obscure and difficult to

11. "§ 54–74. * * *
"(6) 'Any malpractice, or any unlawful or dishonest or unworthy or corrupt or unprofessional conduct', as used in this section, shall be construed to include the improper solicitation of any legal or professional business or employment, either directly or indirectly, *or the acceptance of employment, retainer, compensation or costs from any person, partnership, corporation, organization or association with knowledge that such person, partnership, corporation, organization or association has violated any provision of Article 7 of this chapter* * * *
"§ 54–78. As used in this article:
"(1) A 'runner' or 'capper' is any person, corporation, partnership or association acting in any manner or in any capacity as an agent for an attorney at law within this State *or for any person, partnership, corporation, organization or association which employs, retains or compensates any attorney at law in connection with any judicial proceeding in which such person, partnership, corporation, organization or association is not a party and in which it has no pecuniary right or liability,* in the solicitation or procurement of business for such attorney at law* *or for such person, partnership, corporation, organization or association in connection with any judicial proceedings for*

understand, but the general purpose seems to be to hit any organization which participates in a law suit in which it has no financial interest and also to fasten the charge of malpractice upon any lawyer who accepts employment from such an organization. If the statute should be so interpreted as to forbid a continuance of the activities of the plaintiff corporations in respect to litigation as described in this opinion, it would in large measure destroy their effectiveness.

■ Chapter 36, § 1(a), is aimed at anyone not having a direct interest in the proceeding, who gives, receives or solicits anything of value as an inducement to any person to commence a proceeding in any court or before any administrative agency of the state or in any United States court in Virginia against the Commonwealth of Virginia, or any department or subdivision thereof, or any person acting as an officer or employee of any of the foregoing. Section 1(b) makes it unlawful for anyone who has no direct interest in the subject matter of the proceeding to advise or otherwise instigate the bringing of a suit or action against any of the defendants above described. Here again the language is ambiguous, and doubts have arisen as to whether the giving of advice to persons as to their constitutional rights amounts to the "instigation" [12] of a suit or whether the giving of money to needy litigants amounts to an "inducement" to bring a suit. If so construed as to restrict the activities of the plaintiff corporations disclosed by the evidence in these cases, their effectiveness would be in large measure destroyed. Since Chapters 33 and 36 are vague and ambiguous we do not pass upon their constitutionality.

We have come perforce to these final conclusions since the contrary position cannot be justly entertained. If the Acts of the General Assembly of Virginia should be held to outlaw the activities of the plaintiff corporations, the Commonwealth would be free to use all of its resources in its search for lawful methods to postpone and, if possible, defeat the established constitutional rights of a body of its citizens, while the colored people of the state would be deprived of the resources needed to resist the attack in the state and federal courts. The duty of this court to avoid such a situation, if possible, is manifest.

Accordingly, an injunction will be granted restraining the defendants from proceeding against the plaintiffs under Chapters 31, 32 and 35 because of the activities of the plaintiffs in the past on behalf of the colored people in Virginia as disclosed in the evidence in these cases or because of the continuance of like activities in the future.

As to Chapters 33 and 36, the complaints will be retained for a reasonable time pending the determination of such proceedings in the state courts as the plaintiffs may see fit to bring to secure an interpretation of these statutes; and in the meantime, the court will assume that the defendants will continue to cooperate, as they have in the past, in withholding action under the authority of the statutes until a final decision is reached; and the plaintiffs may petition the court for further action if at any time they deem it their interest to do so.

WALTER E. HOFFMAN, District Judge, concurs.

*which such attorney or such person, partnership, corporation, organization or association is employed, retained or compensated.*

*"The fact that any person, partnership, corporation, organization or association is a party to any judicial proceeding shall not authorize any runner or capper to solicit or procure business for such person, partnership, corporation, organization or asso-*

*ciation or any attorney at law employed, retained or compensated by such person, partnership, corporation, organization or association.*

*"(2) An 'agent' is one who represents another in dealing with a third person or persons."*

12. In Chapter 35 the verb "to instigate" is given a very precise definition, but in Chapter 36 it is given no definition at all.

STERLING HUTCHESON, Chief Judge (concurring in part and dissenting in part).

This Court has before it for determination certain questions which may be resolved into one, simply stated; that is, whether this Court is to be bound by well-known principles of judicial construction, firmly embedded in the fabric of the law and announced time after time by the Supreme Court of the United States, or is this Court to disregard these principles and follow a new course based upon inferences tortuously drawn from expressions which may be found in some of the opinions? A mere statement of the question demonstrates its importance. That importance is accentuated by the fact that the case involves the traditionally delicate balance between the courts of the states and the Federal Courts. The importance of the principle can hardly be over emphasized. .

Repeatedly the Courts have discussed at length the "deeply rooted" doctrine which has become a "time-honored canon of constitutional adjudication" that Federal Courts do not interfere with state legislation when the asserted federal right may be preserved without such interference. We have been told by the Supreme Court in clear language that where it is necessary to construe a state statute in order to determine whether a federal right is involved the construction must be that of the court of the state by which the statute is to be enforced. The rule and the reason for the rule have been made plain by the same authority.

Before discussing the areas in which I find myself in disagreement with my learned associates, I am glad to concur in their decision that the exercise of jurisdiction be withheld as to Chapters 33 and 36 of the Acts of the General Assembly until those statutes have been construed by the courts of the state, although I do not agree with the reasoning upon which that decision is based.

At this point my concurrence ends. Since my views concerning the issues are so much at variance with those expressed in the majority opinion I am constrained to file this separate opinion. In addition to disagreement with the legal conclusions of the majority of the Court, I find myself in disagreement with their statement of the facts. In my opinion the evidence does not support many factual conclusions recited in the elaborate statement found in the opinion. Since the facts are of minor importance at this point, I shall not undertake to set out the numerous errors and omissions which appear. It would serve no useful purpose and would unduly prolong this opinion. However, for the record I register my disagreement.

In passing, attention is called to what I regard as an immaterial and unnecessary discussion of extraneous matter relating to the action of the Supreme Court in the School Segregation Cases, speeches of the Governor of Virginia, expressions contained in a report of a Legislative Commission appointed by the Governor, resolutions of the General Assembly, the Constitutional Referendum, and the decisions involving what is known as the Pupil Placement Act. The lengthy recital pertaining to the legislative history can have only one effect, which is to becloud the issue before the Court and to surround the case with an atmosphere foreign to the judicial calm which should prevail when a legal principle is dealt with. I question the relevancy of much of this material at any time, but certainly it can have no proper place here where we are concerned with orderly procedure in a court of law and with a principle of first importance. The issue should not be obscured by an emotional approach.

Such facts as need be stated here are simple and may be briefly recited. Plaintiffs are corporations chartered under the laws of the State of New York and licensed to do business in Virginia. The defendants are the Attorney General of Virginia and certain other officials, charged with enforcing the laws of the Commonwealth. The principal objectives of the plaintiffs, so far as here pertinent, are the dissemination of information concerning the legal rights of members of the colored race, the organization of

groups to seek the enforcement of such rights, the solicitation of funds to be used, and the use of such funds, in promoting the objectives stated and in financing litigation involving cases in which it is alleged that members of that race are being discriminated against on account of racial origin.

In Extra Session in 1956 the General Assembly of Virginia passed certain statutes which are the subject matter of the present controversy. Those statutes fall into two categories.

The first, consisting of Chapters 31 and 32, are designed to regulate the conduct of persons or corporations who solicit funds to be used and to expend funds to finance or maintain litigation of others. Emphasis is placed upon activities pertaining to conflicting racial interests. The statutes would be applicable to activities such as those engaged in by the plaintiffs and those of other organizations similarly operating in Virginia.

The second set of statutes, being Chapters 33, 35 and 36, are designed to regulate the conduct of those licensed to or engaged in the practice of law in Virginia.

The plaintiffs contend that the statutes are unconstitutional in that if enforced they would be deprived of rights guaranteed under the Fourteenth Amendment to the Constitution of the United States. The relief sought is an injunction and a declaratory judgment. While there are actually two cases brought by separate plaintiffs the issues are such that they are being dealt with as one.

Motions to dismiss for lack of jurisdiction have been filed and there has been a full hearing of the case. The various questions presented have been argued, and may be concisely stated as dealing with the following:

1. Jurisdiction of the Court;

2. Motives of the General Assembly in enacting the statutes;

3. Whether in the exercise of its discretion the Court should accept jurisdiction if it exists;

4. The construction of the statutes.

### Jurisiction of the Court

The jurisdiction of the Court is attacked upon two grounds. The first relates to the jurisdictional amount of $3,000 under the Diversity Statute, and the second relates to the civil rights of a corporation under the Fourteenth Amendment.

(a) While it may be debatable, it is my view that the jurisdictional amount has been shown by the evidence presented sufficiently to justify the Court in hearing the cases.

(b) The defendants rely upon Hague v. C. I. O., 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423, in support of their contention that the corporations are not entitled to the privileges and immunities which the Fourteenth Amendment secured for citizens of the United States. For present purposes a recital of the facts of that case may be limited to the statement that the plaintiffs consisted of certain individuals and a corporation, all of whom contended that the enforcement of a city ordinance would deprive them of the right of free speech. The case is directly in point. There were a number of opinions filed. In the main syllabus the following language is used:

"The ordinances and their enforcement violate the rights under the Constitution of the individual plaintiffs, citizens of the United States; but a complaining corporation can not claim such rights. [307 U.S. at page] 514 [59 S.Ct. at page 963]."

In the syllabus covering the opinion of Mr. Justice Roberts substantially the same analysis is given (syl. 2(b)). See also syllabus 4 of the opinion of Mr. Justice Stone [307 U.S. 527]:

In the opinion of Mr. Justice Roberts, in which Mr. Justice Black concurred, the following appears in 307 U.S. on page 514, 59 S.Ct. on page 963:

"Natural persons, and they alone, are entitled to the privileges and im-

munities which Section 1 of the Fourteenth Amendment secured for 'citizens of the United States'. (Citing Cases.) Only the individual respondents may, therefore, maintain this suit."

In the opinion of Mr. Justice Stone, with Mr. Justice Reed concurring, 307 U.S. on page 527, 59 S.Ct., on page 969, the following language appears:

"Since freedom of speech and freedom of assembly are rights secured to persons by the due process clause, all of the individual respondents are plainly authorized by § 1 of the Civil Rights Act of 1871 to maintain the present suit in equity to restrain infringement of their rights. As to the American Civil Liberties Union, which is a corporation, it cannot be said to be deprived of the civil rights of freedom of speech and of assembly, for the liberty guaranteed by the due process clause is the liberty of natural, not artificial, persons." (Citing cases.)

In the concurring opinion of Mr. Chief Justice Hughes in 307 U.S. on page 532, 59 S.Ct. on page 972, the following appears:

"With respect to the point as to jurisdiction I agree with what is said in the opinion of Mr. Justice Roberts as to the right to discuss the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., being a privilege of a citizen of the United States, but I am not satisfied that the record adequately supports the resting of jurisdiction upon that ground. As to that matter, I concur in the opinion of Mr. Justice Stone."

See dissenting opinion of Mr. Justice Butler.

Mr. Justice McReynolds dissented, being of opinion the case should be remanded to the District Court with instructions to dismiss the bill, he having concluded that the District Court should have refused to interfere with the rights of the municipality to control its parks and streets. He used the following language:

"Wise management of such intimate local affairs, generally, at least, is beyond the competency of federal courts, and essays in that direction should be avoided.

"There was ample opportunity for respondents to assert their claims through an orderly proceeding in courts of the state empowered authoritatively to interpret her laws with final review here in respect of federal questions."

See also interpretation of Mr. Justice Frankfurter in Bridges v. State of California, 314 U.S. 252, 280, 62 S.Ct. 190, 86 L.Ed. 192, where in a dissenting opinion he discusses the rights of the states in respect of their internal affairs. He cites Hague as drawing a distinction between the rights of natural and artificial persons.

The plaintiffs here, both being corporations, contend they are entitled to such protection and point to the earlier case of Grosjean v. American Press Company, 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660,[1] and other cases involving corporations engaged in the publication of newspapers, magazines, etc. A careful examination of Grosjean discloses that it does not support such contention. On page 244 of 297 U.S., on page 447 of 56 S.Ct. the Court, after observing that freedom of speech and of the press *are rights of the same fundamental character,* (the Court did not say the rights are the *same* as would appear to be the interpretation by the majority of this Court) safeguarded by the due process of law clause, used the following language:

"Appellant contends that the Fourteenth Amendment does not apply to corporations; but this is only partly true. A corporation, we have held, is not a 'citizen' within the meaning of the privileges and immunities clause. Paul v. Virginia,

1. Cited in Hague v. C. I. O., 307 U.S. at page 519, 59 S.Ct. at page 965.

8 Wall. 168, 19 L.Ed. 357. But a corporation is a 'person' within the meaning of the equal protection and due process of law clauses, which are the clauses involved here. Covington & Lexington Turnpike Co. v. Sandford, 164 U.S. 578, 592, 17 S.Ct. 198, 41 L.Ed. 560; Smyth v. Ames, 169 U.S. 466, 522, 18 S.Ct. 418, 42 L.Ed. 819."

The opinion concludes with the following language:

"Having reached the conclusion that the act imposing the tax in question is unconstitutional under the due process of law clause because it abridges the freedom of the press, we deem it unnecessary to consider the further ground assigned, that it also constitutes a denial of the equal protection of the laws."

This language should set at rest the contention that that case is controlling as respects the position of the plaintiffs. It could not be clearer that it does not support that contention but it is consistent with Hague.

Grosjean and similar cases relate primarily to and are founded upon the right of freedom of the press. It follows that Hague is controlling and corporations are not entitled to the rights of a natural person. From the nature of the rights it is obvious that it was never intended that a corporation should enjoy such rights as a natural person. It is equally obvious that freedom of the press should not be limited to natural persons. This appears determinative of the rights of the plaintiffs. I realize that it is a question which properly may be determined by the state court and a determination by this Court at this time might be premature. My view is that it should finally dispose of the case.

### Motives of the General Assembly in Enacting the Statutes

The emphasis placed by the majority upon collateral occurrences would indicate reliance upon such occurrences in reaching the conclusions there stated as a justification for disregarding accepted rules of both procedure and construction. The majority has undertaken to assess the motives of the legislative body as a collective whole as distinguished from the familiar rule relating to legislative intention or purpose in construing statutes of uncertain meaning. They say, in effect, that by the enactment of certain other statutes relating to public schools coupled with the statutes now under attack, the Legislature has attempted to provide a legal means of avoiding compliance with the order of the Supreme Court of the United States in the School Segregation Cases. From this premise they infer that the statutes here involved are tainted with illegality by way of association—a somewhat novel concept which seems to have acquired some judicial recognition in recent times. They appear to proceed upon the theory that the Supreme Court has ordered the public schools mixed racially. As has been repeatedly pointed out, the Supreme Court did not make such an order. If lawful means to comply with the order issued and at the same time retain unmixed schools can be found, there is no unlawful thwarting of the Supreme Court mandate and consequently no invalidity shown. However, we are not now concerned with this question.

The issue here goes deeper. That issue is whether the Judicial branch of the Government can sit in judgment upon the collective personal motives or influences activating those charged with the responsibility of conducting the affairs of one of the other co-ordinate branches. If this can be done the result may be far-reaching indeed.

While it is proper for the Court in construing a statute to inquire into the intention or purpose of its enactment when its language is ambiguous or uncertain, inquiry into the motives prompting the members of the legislative body in casting their votes respecting such enactment presents an entirely different situation. Fletcher v. Peck, 6 Cranch 87, 10 U.S. 87; 3 L.Ed. 162, decided in 1810, contains a discussion of the subject which is applicable today. In his opinion

beginning on page 128 of 6 Cranch, Chief Justice Marshall pointed to some of the perplexities which would be involved. Mr. Justice Johnson elaborated upon this in his opinion beginning on page 143 of 6 Cranch. In that case actual fraud coupled with financial gain on the part of legislators was shown but the statutes were recognized as valid. It is inconceivable that the judicial branch of the Government should undertake to exercise the power to inquire into the motives of the legislative branch as a collective body. If the individual members are guilty of fraud or other unlawful conduct, they are subject to legal sanctions as individuals and they are answerable to their constituents at the polls.

Following the lengthy discussion of what is described as the "setting" in which the Acts were passed, the majority ignores Fletcher v. Peck, gives a nod of recognition to Tenney v. Brandhove, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019, with an acknowledgement that a court may not inquire into the legislative motive and proceeds with an assertion that the legislative purpose may be the subject of inquiry, giving as authority Baskin v. Brown, 4 Cir., 174 F.2d 391, 392, 393, and Davis v. Schnell, D.C., 81 F.Supp. 872, 878–880, affirmed by per curiam decision in 336 U.S. 933, 69 S.Ct. 749, 93 L.Ed. 1093, where it was noted that Mr. Justice Reed was of opinion that since a constitutional provision of a state was involved, probable jurisdiction should be noted and the case argued. From the language used by the majority, it would appear that purpose or intention have been confused with motive. The first case relied upon, Davis v. Schnell, was from a three-judge District Court in Alabama. It involved the right to vote. The Court recited in detail the legislative history of the act. In discussing its views in Baskin v. Brown, the Court cited Davis v. Schnell and quoted from that opinion concerning the intention and purpose of the legislation. As I read both opinions, they use the term "purpose" as similar or synonymous with "intention".

Neither discusses the motives influencing the Legislature and in neither is Fletcher v. Peck nor Tenney v. Brandhove mentioned. While they tend to give color to the suggestion that motive may be considered, I am unable to accept them as authority for such theory. And see Lassiter v. Taylor, D.C.E.D.N.C.1957, 152 F.Supp. 295, from which may be inferred a position contrary to the Davis and Baskin cases. Lane v. Wilson, 307 U.S. 268, 59 S.Ct. 872, 83 L.Ed. 1281, is the third case upon which the majority bases its conclusion upon this point. It must be borne in mind that Lane v. Wilson was an action for damages brought under a statute conferring original jurisdiction in such cases upon the Federal Court.

In none of these cases is the question so fully presented and discussed as in Fletcher and Tenney, in both of which the underlying principle is recognized.

If it be conceded that the Courts may inquire into the personal motives of legislators a maze of avenues of possible inquiry is seen. Must the motive be corrupt; what proof will show corruption— a state of mind or personal gain? Would undue influence vitiate the act? Must the improper motive exist on the part of a majority; if not on the part of a majority, on what number? If bad motive on the part of a majority of the legislature is required, is it necessary that it be a majority of the entire body or of only those who supported the legislation? What type of proof would be sufficient to show improper motive? Is the burden of proof similar to that required in ordinary cases involving fraud? Must actual fraud be proven or is constructive fraud sufficient? In recognition of the principle that the acts of a sovereign are pure, upon what historic concept can one of the three great branches of a republican form of government denounce as impure the act of a co-ordinate branch? If this can be done, will it be necessary that the third co-ordinate branch concur in the result? The questions posed show the absurdity of the contention urged by the plaintiffs and apparently approved by the

majority of this Court, that the motives of the legislature are a proper subject of inquiry.

Before leaving this subject, I call attention to what seems an inconsistency. Having assumed the power to interpret the statutes and basing that interpretation, at least in part, upon the motives of the Legislature, the majority denounces only some of the statutes and leaves the others for construction by the state court. There naturally arises the question of why such motives should taint only a limited number of the statutes and not others constituting this alleged unlawful scheme.

### Whether in the Exercise of Its Discretion the Court Should Accept Jurisdiction If It Exists

Time after time the Courts have given expression to the propriety of recognizing the delicate balance between the Courts of the states and the Federal Courts. This is as important now as it has been in the past.

This principle of judicial interpretation is based upon the fundamental concept of separate sovereigns embodied in the Constitution of the United States. The Courts have announced in clear and specific language the rule and the reasons for the rule.

Cases almost without number decided by the Supreme Court have recognized and upheld the doctrine now involved which may be illustrated by Spector Motor Service, Inc., v. McLaughlin, 323 U.S. 101, 65 S.Ct. 152, 153, 89 L.Ed. 101, decided in 1944. In that case suit was brought in a Federal District Court, 47 F.Supp. 671, to enjoin the enforcement of a tax imposed by the State of Connecticut and a declaratory judgment. The Court proceeded to pass upon the constitutional questions presented. The statute had not been construed by the Connecticut Court. The following language was used by the Supreme Court:

"It was conceded below that if the Connecticut tax was construed to cover petitioner it would run afoul the Commerce Clause, were this

Court to adhere to what Judge Learned Hand called 'an unbroken line of decisions.' On the basis of what it deemed foreshadowing 'trends', the majority ventured the prophecy that this Court would change its course, and accordingly sustained the tax. In view of the far-reaching import of such a disposition by the Circuit Court of Appeals we brought the case here."

After referring to questions touching the taxing powers of the states and their relation to the Commerce Clause, the Court said:

"We would not be called upon to decide any of these questions of constitutionality, with their varying degrees of difficulty, if, as the District Court held, the statute does not at all apply to one, like petitioner, not authorized to do intrastate business. Nor do they emerge until all other local Connecticut issues are decided against the petitioner. But even if the statute hits aspects of an exclusively interstate business, it is for Connecticut to decide from what aspect of interstate business she seeks an exaction. It is for her to say what is the subject matter which she has sought to tax and what is the calculus of the tax she seeks. Every one of these questions must be answered before we reach the constitutional issues which divided the court below.

"Answers to all these questions must precede consideration of the Commerce Clause. To none have we an authoritative answer. Nor can we give one. Only the Supreme Court of Errors of Connecticut can give such an answer. But this tax has not yet been considered or construed by the Connecticut courts. We have no authoritative pronouncements to guide us as to its nature and application. That the answers are not obvious is evidenced by the different conclusions as to the scope of the statute reached by the two lower courts. The Connecticut Su-

preme Court may disagree with the District Court and agree with the Circuit Court of Appeals as to the applicability of the statute. But this is an assumption and at best 'a forecast rather than a determination.' Railroad Commission of Texas v. Pullman Co., 312 U.S. 496, 499, 61 S.Ct. 643, 645, 85 L.Ed. 971. Equally are we without power to pass definitively on the other claims urged under Articles I and II of the Connecticut Constitution. If any should prevail, our constitutional issues would either fall or, in any event, may be formulated in an authoritative way very different from any speculative construction of how the Connecticut courts would review this law and its application. Watson v. Buck, 313 U.S. 387, 401–402, 61 S.Ct. 962, 966, 967, 85 L.Ed. 1416.

"If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality—here the distribution of the taxing power as between the State and the Nation—unless such adjudication is unavoidable. And so, as questions of federal constitutional power have become more and more intertwined with preliminary doubts about local law, we have insisted that federal courts do not decide questions of constitutionality

on the basis of preliminary guesses regarding local law. Railroad Commission of Texas v. Pullman Co., supra; City of Chicago v. Fieldcrest Dairies, 316 U.S. 168, 62 S.Ct. 986, 86 L.Ed. 1355; In re Central R. Co. of New Jersey, 3 Cir., 136 F.2d 633. See also Burford v. Sun Oil Co., 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424; Meredith v. City of Winter Haven, 320 U.S. 228, 235, 64 S.Ct. 7, 11 [88 L.Ed. 9]; Green v. Phillips Petroleum Co., 8 Cir., 119 F.2d 466; Findley v. Odland, 6 Cir., 127 F.2d 948; United States v. 150.- 29 Acres of Land, 7 Cir., 135 F.2d 878. Avoidance of such guesswork, by holding the litigation in the federal courts until definite determinations on local law are made by the state courts, merely heeds this time-honored canon of constitutional adjudication.

"We think this procedure should be followed in this case."

As will be later shown, the foregoing rule has been consistently applied with a negligible number of exceptions.

On this issue of vital importance the majority opinion seems based upon a quotation found in a dissenting opinion in Bryan v. Austin, D.C.E.D.S.C., 148 F. Supp. 563, 567, 568. The entire text of that portion of the dissenting opinion so relied upon may be found in the footnote[2]. The italicized portion is that

---

2. "I recognize, of course, that, in the application of the rule of comity, a federal court should stay action pending action by the courts of a state, where it is called upon to enjoin the enforcement of a state statute which has not been interpreted by the state courts, and where the statute is susceptible of an interpretation which would avoid constitutional invalidity. As the federal courts are bound by the interpretation placed by the highest court of a state upon a statute of that state, they should not enjoin the enforcement of a statute as violative of the Constitution in advance of such an interpretation, if it is reasonably possible for the statute to be given an interpretation which will render it constitutional. *This is all that is held*

*by the Supreme Court in such cases as Shipman v. DuPre, 339 U.S. 321, 70 S. Ct. 640, 94 L.Ed. 877, and A. F. of L. v. Watson, 327 U.S. 582, 596, 598, 66 S. Ct. 761, 90 L.Ed. 873. The Supreme Court in Alabama Public Service Commission v. Southern Railway Co., 341 U.S. 341, 344, 71 S.Ct. 762, 95 L.Ed. 1002, recognizes that proceedings should be stayed only where there is involved 'construction of a state statute so ill-defined that a federal court should hold the case pending a definitive construction of that statute in the state courts'. In the case of Toomer v. Witsell, 334 U.S. 385, 68 S.Ct. 1156, 92 L.Ed. 1460, in which the District Court had upheld the constitutionality of a state statute, the Supreme Court*

part omitted from the quotation incorporated into the majority opinion.

With due deference to the learned author of that opinion, my examination of the cases cited does not lead me to the same conclusion as that stated, nor have I found any other pronouncements of the Supreme Court which lead me to that conclusion. After an earlier reference to the celebrated declaration of Chief Justice Marshall in Cohens v. Virginia, 6 Wheat. 264, 5 L.Ed. 257, concerning the usurpation of jurisdiction, he concedes that in Shipman v. DuPre, 339 U.S. 321, 70 S.Ct. 640, 94 L.Ed. 877, and A. F. of L. v. Watson, 327 U.S. 582, 600, 66 S.Ct. 761, 90 L.Ed. 873, the Supreme Court held that the Federal Courts are bound by interpretation of the statute by the highest court of the state and should not enjoin the enforcement of such statute as violative of the Constitution in advance of such interpretation. The following language is then used:

" * * * if it is reasonably possible for the statute to be given an interpretation which will render it constitutional. This is all that is held by the Supreme Court in such cases as * * *" Shipman and A. F. of L.

The learned author then asserts that "the Supreme Court in Alabama Public Service Commission v. Southern Railway Co., 341 U.S. 341, 344, 71 S.Ct. 762, 95 L.Ed. 1002, recognizes that proceedings should be stayed *only* there is involved 'construction of a state statute so ill-defined that a federal court should hold the case pending a definitive construction of that statute in the state courts.' " (Emphasis supplied.)

I find nothing in Shipman referring to the susceptibility of the statute to different interpretations.

A. F. of L. v. Watson, contains the following language in 327 U.S. on page 599, 66 S.Ct. on page 769:

"The doubts concerning the meaning of the Florida law indicate that such a procedure is peculiarly appropriate here."

The procedure referred to was an interpretation of the Florida constitutional amendment by the state court before the Federal Court exercised jurisdiction. The case was reversed and remanded, with directions that the bill be retained pending determination of the state court proceedings.

I do not read Alabama as supporting the assertion that proceedings should be stayed *only* where an ill-defined statute is involved. The only language I find bearing resemblance to such a doctrine appears in 341 U.S. on page 344, 71 S. Ct. on page 765, as follows:

"Federal jurisdiction in this case is grounded upon diversity of citizenship as well as the allegation of a federal question. Exercise of that jurisdiction does not involve construction of a state statute so ill-defined that a federal court should hold the case pending a definitive construction of that statute in the state courts, e. g., Railroad Commission of Texas v. Pullman Co., 1941, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971; Shipman v. DuPre, 1950, 339 U.S. 321, 70 S.Ct. 640, 94 L.Ed. 877. We also put to one side those cases in which the constitutionality of a state statute itself is drawn into question, e. g., Toomer v. Witsell,

*reversed the decision without staying proceedings for action by the state courts. And in Doud v. Hodge, 350 U.S. 485, 76 S.Ct. 491, 100 L.Ed. 577, the Supreme Court reversed the dismissal of a case by a District Court, 127 F.Supp. 853, where the dismissal was granted on the ground that a statute alleged to be unconstitutional had not been passed upon by the courts of*

*the state. The rule as to stay of proceedings pending interpretation of a state statute by the courts of the state can have no application to a case, such as we have here, where the meaning of the statute is perfectly clear and where no interpretation which could possibly be placed upon it by the Supreme Court of the state could render it constitutional."*

1948, 334 U.S. 385, 68 S.Ct. 1156, 92 L.Ed. 1460."

In that case suit was brought in a Federal Court to enjoin an order of the Alabama Public Service Commission. Without prior action by the state court, the Federal Court heard the case and rendered judgment. After pointing out that state court review was available to the plaintiff, the Supreme Court referring to the "scrupulous regard for the rightful independence of state governments which should at all times actuate the federal courts", said:

> "Considering that 'few public interests have a higher claim upon the discretion of a federal chancellor than the avoidance of needless friction with state policies,' the usual rule of comity must govern the exercise of equitable jurisdiction by the District Court in this case. Whatever rights appellee may have are to be pursued through the state courts."

In reversing the lower Court, the Supreme Court cited with approval Great Lakes Dredge & Dock Co. v. Huffman, 1943, 319 U.S. 293, 297–298, 63 S.Ct. 1070, 87 L.Ed. 1407.

The other cases referred to in the dissenting opinion are Toomer v. Witsell, supra, and Doud v. Hodge, 350 U.S. 485, 76 S.Ct. 491, 100 L.Ed. 577. Toomer, at best, is also negative authority. In that case jurisdiction was exercised with no discussion of the principle here involved. Doud merely said that the Supreme Court has never held that a District Court is without jurisdiction in such cases, although in reversing the District Court, 127 F.Supp. 853, for dismissing for lack of jurisdiction the Supreme Court expressly declined to prescribe further procedure on remand. It is obvious that the Supreme Court intended that the approved procedure of obtaining construction by the state court was to be followed.

From what has been said all that I can read into the cases cited as authority for the affirmative assertion that proceedings should be stayed until state court action *only* where an ill-defined statute is involved, is at the most of a negative character and limited to an insignificant number of cases.

The majority adopts that portion of the dissenting opinion in Bryan v. Austin, and proclaims as a policy of judicial interpretation that a stay of proceedings in the Federal Courts is not required in cases in which the state statutes at issue are free of doubt or ambiguity. It is respectfully submitted that the pronouncement of such a doctrine is not warranted by the authorities cited. It is true that in some few cases the Supreme Court has not required such prior interpretation but this fact falls far short of establishing a rule of procedure under which proceedings in a Federal Court in a case such as this should be stayed *only* where the statute involved is so ill-defined that its constitutionality is doubtful until it is construed judicially.

Even should the rule so announced be the correct one, it would have no application in this case, as a reasonably careful examination of the statutes will disclose the necessity for interpretation, as later pointed out.

The rule laid down by the Supreme Court and consistently followed is that cited in Spector Motor Service, Inc., v. McLaughlin, supra. The majority opinion has cited Spector Motor Company and Government and Civic Employees Organizing Committee, C. I. O. v. Windsor, 347 U.S. 901, 74 S.Ct. 429, 98 L.Ed. 1061 and 353 U.S. 364, 77 S.Ct. 838, 1 L.Ed.2d 894; Shipman v. DuPre, supra; A. F. of L. v. Watson, supra. This Court is bound to follow, distinguish or disregard those cases and others to be cited. It has no power to reverse.

The language of the majority discloses that my learned associates have followed the example of the majority of the Court of the Second Circuit in Spector. [Spector Motor Service, Inc., v. Walsh, 139 F.2d 809] To again quote the Su-

preme Court in that case on page 103 of 323 U.S., on page 153 of 65 S.Ct.:

"On the basis of what it deemed foreshadowing 'trends', the majority ventured the prophecy that this Court would change its course, and accordingly sustained the tax. In view of the far-reaching import of such a disposition by the Circuit Court of Appeals we brought the case here."

As has been seen, after emphasizing the "deeply rooted" doctrine which it termed "this time-honored canon of constitutional adjudication", the Supreme Court reversed the Circuit Court and remanded the case to await interpretation by the state court.

The decisions of the Supreme Court proclaiming and repeating this principle called the "doctrine of abstention" in Railroad Commission of Texas v. Pullman Company, 312 U.S. 496, at page 501, 61 S.Ct. 643, at page 645, 85 L.Ed. 971, are so numerous and contain such apt expressions that determining which should be cited and discussed presents a problem. An exhaustive analysis of all would result in a repetitious and unduly long discussion.

Railroad Commission of Texas v. Pullman Company, supra, appears a good starting point. In that case a three-judge District Court, 33 F.Supp. 675, enjoined an order of the Texas Railroad Commission. On appeal the Court referred to the fact that the Court consisted of an able and experienced judge of the circuit which includes Texas and of two capable district judges trained in Texas law. Then the Court said:

"Had we or they no choice in the matter but to decide what is the law of the state, we should hesitate long before rejecting their forecast of Texas law. But no matter how seasoned the judgment of the district court may be, it cannot escape being a forecast rather than a determination. The last word on the meaning of Article 6445 of the [Vernon's] Texas Civil Statutes, and therefore the last word on the

statutory authority of the Railroad Commission in this case, belongs neither to us nor to the district court but to the supreme court of Texas. In this situation a federal court of equity is asked to decide an issue my making a tentative answer which may be displaced tomorrow by a state ajudication."

Could the Court have expressed itself in clearer terms?

Referring to earlier cases the Court continued:

"These cases reflect a doctrine of abstention appropriate to our federal system whereby the federal courts, 'exercising a wise discretion', restrain their authority because of 'scrupulous regard for the rightful independence of the state governments' and for the smooth working of the federal judiciary (citing cases). This use of equitable powers is a contribution of the courts in furthering the harmonious relation between state and federal authority without the need of rigorous congressional restriction of those powers."

The District Court was reversed and the case remanded with directions to retain the bill pending a determination of proceedings in the state court.

What change has come about since 1941 to justify a court in disregarding this clearly stated doctrine?

I find no expression from the Supreme Court changing this rule during the intervening years. On the contrary, as late as May 1957 the Court delivered its opinion in Government and Civic Employees Organizing Committee, C. I. O. v. Windsor, 353 U.S. 364, 77 S.Ct. 838, 1 L.Ed.2d 894. The procedural facts of that case are illuminating and significant. A labor organization and one of its members filed suit against officials of Alabama Alcoholic Beverage Control Board, of which the individual member was an employee. Plaintiffs sought an injunction and declaratory judgment to restrain the enforcement of a statute of Alabama. A three-judge court was con-

vened. Plaintiffs contended that the statute was susceptible to no possible construction other than that of unconstitutionality and that the Federal Court should decline to stay proceedings pending action in the state court. Loss of members by the union and loss of employment benefits by the members were alleged. As here, no state action was pending. Toomer v. Witsell, supra, appears to have been the authority relied upon by plaintiffs. The Court, after citing and discussing cases referred to by me, declined to exercise jurisdiction pending an exhaustion of state administrative and judicial remedies. 116 F. Supp. 354. The Supreme Court affirmed. 347 U.S. 901, 74 S.Ct. 429, 98 L.Ed. 1061. Thereafter suit was filed in an Alabama Court, which declared the statute applicable to the complainant, its activities and its members and the injunction was denied. On appeal the final decree of that Court was affirmed by the Supreme Court of Alabama. 262 Ala. 285, 78 So.2d 646. The case was again submitted to the District Court. 146 F. Supp. 214. That Court said on page 216:

> "After a thorough reading and consideration of the final decree of the Circuit Court of Montgomery County in Equity and of the opinion of the Supreme Court of Alabama heretofore mentioned, it is clear to us that the Alabama courts have not construed the Solomon Bill in such a manner as to render it unconstitutional, and, of course, we can not assume that the State court will ever so construe said statute."

Judgment was entered accordingly.

Upon appeal the Supreme Court in a per curiam opinion (353 U.S. 364, 77 S.Ct. 838, 839, 1 L.Ed.2d 894), after observing that "none of the constitutional contentions presented in the action pending in the United States District Court were advanced in the state court action", said:

> "We do not reach the constitutional issues. In an action brought to restrain the enforcement of a state statute on constitutional grounds, the federal court should retain jurisdiction until a definitive determination of local law questions is obtained from the local courts. One policy served by that practice is that of not passing on constitutional questions in situations where an authoritative interpretation of state law may avoid the constitutional issues. Spector Motor Service v. McLaughlin, 323 U.S. 101, 105, 65 S.Ct. 152, 154, 89 L.Ed. 101. Another policy served by that practice is the avoidance of the adjudication of abstract, hypothetical issues. Federal courts will not pass upon constitutional contentions presented in an abstract rather than in a concrete form. Rescue Army v. Municipal Court, 331 U.S. 549, 575, 584, 67 S.Ct. 1409, 1423, 1427, 91 L.Ed. 1666. The bare adjudication by the Alabama Supreme Court that the union is subject to this Act does not suffice, since that court was not asked to interpret the statute in light of the constitutional objections presented to the District Court. If appellants' freedom-of-expression and equal-protection arguments had been presented to the state court, it might have construed the statute in a different manner. Accordingly, the judgment of the District Court is vacated, and this cause is remanded to it with directions to retain jurisdiction until efforts to obtain an appropriate adjudication in the state courts have been exhausted."

It is worth noting that in June 1957 a three-judge United States District Court sitting in the Eastern District of North Carolina in Lassiter v. Taylor, 152 F.Supp. 295, 297, had before it a case attacking the constitutionality of a statute of the state prescribing a literacy test for voters. The Court said:

> "The only question in the case is whether the Act of March 29, 1957 should be declared void and its enforcement against plaintiffs enjoined by the court on the ground

that it is violative of their rights under the Federal Constitution."

The Court then proceeded on page 298:

"Before we take any action with respect to the Act of March 27, (sic) 1957, however, we think that it should be interpreted by the Supreme Court of North Carolina in the light of the provisions of the State Constitution. Government and Civic Employees Organizing Committee, etc. v. Windsor, [353 U.S. 364] 77 S.Ct. 838 [1 L.Ed.2d 894]."

The opinion was per curiam but significantly the distinguished jurist who wrote the dissenting opinion in Bryan v. Austin, supra, and who sat on the Court in Baskin v. Brown, was a member of that Court. It should be recalled at this point that Government and Civic Employees Organizing Committee, C. I. O. v. Windsor was decided the previous month.

Inferentially at least, it would appear that the author of the dissenting opinion upon which the majority rests its decision has revised his views since that opinion was filed and has accepted the views reflected in the earlier cases of Doby v. Brown, infra, and Hood v. Board of Trustees, infra, and the later cases of Government and Civic Employees Organizing Committee, C. I. O. v. Windsor, supra, and Lassiter v. Taylor, supra. Attention is called to Hudson v. American Oil Company, D.C.E.D.Va., 152 F.Supp. 757, now before the Court of Appeals for the Fourth Circuit, in which decision has been deferred pending a pronouncement by the Supreme Court of Appeals of Virginia of a question involving an easement in connection with which the state court has not yet announced the policy of the state.

The concurring opinion of Mr. Justice Frankfurter in Alabama Public Service Commission v. Southern Ry. Co., supra, contains an informative review of the legislative history of the statutes opening the inferior Federal Courts to claims arising under state statutes founded on rights under the Constitution and laws of the United States. Prior to 1875 such claims were pursued in the state courts exclusively and brought to the Supreme Court for review of the Federal question. Upon numerous occasions since 1875, Congress has placed restrictions around interference with state actions by the lower Federal Courts and in 1910 an act was passed placing jurisdiction to restrain action of state officials in a District Court consisting of three judges, with the right of appeal directly to the Supreme Court, Act June 18, 1910, § 17, 36 Stat. 557. Not satisfied with this safeguard, additional limitations have been placed upon inferior courts where the action involves matters affecting state laws. In addition to that discussion, attention is called to the action of Congress as late as 1948, when it enacted Title 28, Section 2254, United States Code, spelling out in detail a prohibition against Federal action on applications for writs of habeas corpus affecting petitioners in custody pursuant to judgment of state courts until remedies available in courts of the state have been exhausted.

In 1938, the Supreme Court decided the landmark case of Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, in which it recognized that there had been an invasion of rights reserved by the Constitution to the states and proceeded to correct the error. The case is not in point here except as casting light on the recognition by the Supreme Court of the limited jurisdiction of Federal Courts and it emphasizes the "delicate balance" so often mentioned. The discussion of Mr. Justice Frankfurter in Alabama Public Service Commission v. Southern Ry. Co., supra, is also illuminating. As will be seen from that opinion he interpreted the majority opinion there as laying down a fixed rule that in all such cases action by the state court is a prerequisite to interference by the Federal Court. If his interpretation of Alabama is correct, and it has been followed rather consistently, there is no occasion for further congressional action upon this point as suggested by the majority of this Court. This demonstrates the

fallacy of the somewhat disturbing assumption of the majority opinion that unless jurisdiction has been restricted by Congress or the Supreme Court, the inferior United States Courts are free to assume unlimited jurisdiction.

In Douglas v. City of Jeannette (Pennsylvania), 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324, and a number of similar cases, a somewhat stricter rule against jurisdiction of the Federal Courts appears to have been recognized as applicable to statutes imposing criminal sanctions such as are here involved. However, I prefer to rest my conclusions upon the broad, general rule announced in the cases before cited and discussed without limiting consideration of the question to a special type of litigation. The underlying principle is the same whether the case involves a civil suit for the collection of tax or the enforcement of a statute denouncing specified conduct as a crime. Both involve the police power and both involve the delicate balance which prevails between sovereign powers.

The cases last cited and quoted from should be sufficient to show with certainty the proper course to be followed by this Court. However, these cases by no means include all in point and, as earlier indicated, the problem here is to limit this discussion to avoid becoming burdensome with a discussion of cumulative authority. Some of the cases in which the doctrine is announced with equal emphasis and apt language are listed in the footnote.[3] An examination of these cases discloses that upon numerous occasions the lower courts have undertaken to pass upon the constitutional validity of state statutes only to be reversed by the Supreme Court without consideration by it of the constitutional question, with directions that the lower court await an interpretation of the statutes by the courts of the state affected, e. g. Railroad Commission of Texas v. Pullman Co.; Great Lakes Dredge & Dock Co. v. Huffman; Alabama Public Service Commission v. Southern Ry. Co.; Government & Civic Employees Organizing Committee, C. I.

3. Matthews v. Rodgers, 1932, 284 U.S. 521, 525–526, 52 S.Ct. 217, 76 L.Ed. 447; Great Lakes Dredge & Dock Co. v. Huffman, 1943, 319 U.S. 293, 296–301, 63 S.Ct. 1070, 87 L.Ed. 1407; Meredith v. City of Winter Haven, 1943, 320 U.S. 228, 232, 64 S.Ct. 7, 88 L.Ed. 9; Alabama State Federation of Labor, etc. v. McAdory, 1945, 325 U.S. 450, 65 S.Ct. 1384, 89 L.Ed. 1725; A. F. of L. v. Watson, 1946, 327 U.S. 582, 600, 66 S.Ct. 761, 90 L.Ed. 873; Rescue Army v. Municipal Court, 1947, 331 U.S. 549, 67 S.Ct. 1409, 91 L.Ed. 1666; Shipman v. DuPre, 1950, 339 U.S. 321, 70 S.Ct. 640, 94 L.Ed. 877; Stefanelli v. Minard, 1951, 342 U.S. 117, 120–123, 72 S.Ct. 118, 96 L.Ed. 138; Albertson v. Millard, 1953, 345 U.S. 242, 73 S.Ct. 600, 97 L.Ed. 983; Doud v. Hodge, 1956, 350 U.S. 485, 76 S.Ct. 491, 100 L.Ed. 577; Beasley v. Texas & Pacific R. Co., 191 U.S. 492, 24 S.Ct. 164, 48 L.Ed. 274; Cavanaugh v. Looney, 248 U.S. 453, 457, 39 S.Ct. 142, 63 L.Ed. 354; Fenner v. Boykin, 271 U.S. 240, 46 S.Ct. 492, 70 L.Ed. 927; Gilchrist v. Interborough Rapid Transit Co., 279 U.S. 159, 49 S.Ct. 282, 73 L.Ed. 652; Hawks v. Hamill, 288 U.S. 52, 61, 53 S.Ct. 240, 77 L.Ed. 610; City of Harrisonville, Mo. v. W. S. Dickey Clay Mfg. Co., 289 U.S. 334, 53 S.Ct. 602, 77 L.Ed. 1208; U. S. ex rel. Greathouse v. Dern, 289 U.S. 352, 53 S.Ct. 614, 77 L.Ed. 1250; Glenn v. Field Packing Co., 290 U.S. 177, 54 S.Ct. 138, 78 L.Ed. 252; Lee v. Bickell, 292 U.S. 415, 54 S.Ct. 727, 78 L.Ed. 1337; Commonwealth of Pennsylvania v. Williams, 294 U.S. 176, 55 S.Ct. 380, 79 L.Ed. 841; Spielman Motor Sales Co. v. Dodge, 295 U.S. 89, 55 S.Ct. 678, 79 L.Ed. 1322; Di Giovanni v. Camden Fire Ins. Ass'n, 296 U.S. 64, 73, 56 S.Ct. 1, 80 L.Ed. 47; Beal v. Missouri Pac. R. Corp., 312 U.S. 45, 61 S.Ct. 418, 85 L.Ed. 577; City of Chicago v. Fieldcrest Dairies, 316 U.S. 168, 62 S.Ct. 986, 86 L.Ed. 1355; Burford v. Sun Oil Co., 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424; Eccles v. Peoples Bank of Lakewood Village, Cal., 333 U.S. 426, 431, 68 S.Ct. 641, 92 L.Ed. 784.

Among cases from lower courts peculiarly applicable are:

Lassiter v. Taylor, D.C., 152 F.Supp. 295, 298; Doby v. Brown, 4 Cir., 232 F.2d 504; Hood v. Board of Trustees, 4 Cir., 232 F.2d 626.

For further collection of authorities see:

Tribune Review Publishing Co. v. Thomas, D.C., 120 F.Supp. 362, 372, and discussion in Meredith v. City of Winter Haven, supra.

O. v. Windsor. There are many other cases which might be cited and discussed. These cases which have announced the law clearly, are not being followed by the majority. They have not been distinguished and only a negligible number have been cited. The majority have elected to base their decision upon authority for which the most that can be said is that it is of a negative character and upon a "prophecy of foreshadowing 'trends'." This method of judicial interpretation based upon prophecy was commented upon and rejected by the Supreme Court in Spector.

### The Construction of the Statutes

This brings us to a consideration of the questioned statutes.

As far as pertinent here, Chapters 31 and 32 deal with the authority of the state in the exercise of the police power to pass laws regulating the conduct of corporations operating within the state. Regulatory statutes of this nature are fully recognized and any number might be called to mind. People of State of New York ex rel. Bryant v. Zimmerman, 278 U.S. 63, 49 S.Ct. 61, 73 L.Ed. 184, appears to be the leading case applicable here. There was involved a statute requiring the disclosure of names of members of certain organizations. Petitioner was a member of the Ku Klux Klan, an organization to which the statute was applicable. For failing to comply with the provisions of the statute petitioner was held in custody by the state authorities. Upon denial of a writ of habeas corpus by the state court he appealed to the Supreme Court of the United States. Justice McReynolds was of opinion the case should be dismissed for lack of jurisdiction without any consideration of the merits. The majority of the Court held that the case was of such nature that it had jurisdiction, but recognized the power of the state to enforce the statute saying that the rights of petitioner must yield to the rightful exertion of the police power. The petition was denied.

It has been suggested that the statute was sustained because of the nature of the activities of the Ku Klux Klan. It is true that the Court referred to such activities when discussing the exception of certain other organizations from the operation of the statute but I do not understand the language of the Court as holding that this was a decisive factor.

Another significant case is Thomas v. Collins, 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430. That case involved a Texas statute, Vernon's Ann.Civ.St. art. 5154a, which required paid labor organizers to register with the Secretary of State and obtain an organizer's card before soliciting members within the state. An injunction was issued restraining the petitioner from violating the statute. Subsequently he was held guilty of contempt for violating the order. Habeas corpus was denied by the Supreme Court of Texas. On appeal, the Supreme Court of the United States reversed the judgment of conviction. However, in 323 U.S. at page 540, 65 S.Ct. at page 327, the Court said:

"We think a requirement that one must register before he undertakes to make a public speech to enlist support for a lawful movement is quite incompatible with the requirements of the First Amendment.

"*Once the speaker goes further,* however, and engages in conduct which amounts to more than the right of free discussion comprehends, *as when he undertakes the collection of funds or securing subscriptions,* he enters a realm where a reasonable registration or identification requirement may be imposed. In that context such solicitation would be quite different from the solicitation involved here. It would be free speech plus conduct akin to the activities which were present, and which it was said the State might regulate in Schneider v. State, supra, [308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155], and Cantwell v. State of Connecticut, supra. That however must be done, and the restriction applied, in such a manner as not to intrude upon the rights of

free speech and free assembly. In this case the separation was not maintained." (Emphasis supplied.)

See also the concurring opinion of Mr. Justice Jackson. Cf. Douglas v. City of Jeannette (Pennsylvania), supra.

In a dissenting opinion, concurred in by Chief Justice Stone and Justice Frankfurter, beginning at page 548 of 323 U.S., at page 331 of 65 S.Ct., Justice Roberts said:

"The right to express thoughts freely and to disseminate ideas fully is secured by the Constitution as basic to the conception of our government. A long series of cases has applied these fundamental rights in a great variety of circumstances. Not until today, however, has it been questioned that there was any clash between this right to think one's thoughts and to express them and the right of people to be protected in their dealings with those who hold themselves out in some professional capacity by requiring registration of those who profess to pursue such callings."

While the statutes impose the duty to register and furnish information concerning names of persons engaged in the solicitation of and contribution to funds for certain purposes, it does not prohibit the solicitation or expenditures of funds provided registration is had and the required information filed. We are not called upon at this time to determine whether the statutes are constitutional or unconstitutional. That is for determination after action by the state court. Should it be proper to follow the reasoning of the majority the Court would be called upon to determine whether they are so plainly unconstitutional that by no interpretation could they be held constitutional. I have found no case under which it can be said they are so plainly in violation of the Constitution that by no interpretation can they be held otherwise.

The remaining statutes, Chapters 33, 35 and 36, dealing with the practice of law, are based in part upon the canons of ethics recognized by the American Bar Association, and in part are declaratory of common law offenses.

The statutes are lengthy and the language employed is involved. A consideration of key words found with relation to other general language is necessary to determine the meaning.

Chapter 33, as applied to attorneys, revolves around the phrase "improper solicitation". As applied to a "runner" or "capper" the act denounced is acting as an agent for an attorney, etc.

Chapter 35 denounces as an offense the instigating or attempting to instigate a person or persons to institute a suit. The statutory definition of "instigating" is somewhat ambiguous and will require a judicial interpretation.

In Chapter 36 the significant language to be construed relates to *inducing* one to act and the giving of advice by one whose professional advice has not been sought in accordance with the canons of legal ethics.

It clearly appears that the language employed must be construed as applied to the facts involved. Upon such construction will depend the decision of whether the statutes apply to the activities of the plaintiffs and the members of the bar employed by them.

It is difficult to understand how the majority reached its conclusion that Chapters 31, 32 and 35 are clearly in violation of the Constitution but Chapters 33 and 36 will require an interpretation. If this Court determines that it should hold Chapters 31, 32 and 35 invalid, why should it not declare Chapters 33 and 36 valid instead of referring them to the state court for interpretation? Further, they say clause (3). Section 2, chapter 32 is unconstitutional because "vague and indefinite" but chapters 33 and 36, being "vague and ambiguous" must be interpreted by the state court before their constitutionality can be determined.

At the hearing certain officers of the plaintiff corporations testified. Upon that testimony the majority has incorporated in its opinion a statement of the activities of the corporations with re-

lation to the institution of litigation to which they are not parties. Assuming that statement to be correct it is questionable that Chapters 33, 35 or 36 would be applicable to those engaged in such activities. I express no opinion upon this beyond observing that obviously a question would be involved. Certain it is that in reaching an answer to that question it will be necessary that the meaning of the statutes be construed.

Plaintiffs complain that the statutes are directed at them. Whether this be true or not is immaterial. The evidence shows there are other organizations engaged in counter activities in Virginia. However, this fact merits only passing reference. As pointed out in People of State of New York ex rel. Bryant v. Zimmerman, supra, the constitutional validity of a statute is not affected by the failure of the Legislature to pass laws covering all cases it might reach or covering the whole field of possible abuse.

I expressly refrain from expressing an opinion concerning the constitutional validity of the statutes. As applied by the Courts they might be held valid, they might be found invalid or they might be held valid in part and invalid in part. The point here is that they should be· construed by the Courts of the State in which their enforcement will take place. Then and only then can the Federal Courts properly inquire as to their invasion of rights guaranteed by the Constitution of the United States. To do otherwise would be both to dismiss the obviously questionable language used in places in the statutes and to disregard firmly established principles of construction long accepted by the Federal Courts as applicable in like situations. In this case the Court should observe the "Doctrine of Abstention" referred to by the District Court in Government and Civic Employees Organizing Committee, C. I. O. v. Windsor, 116 F.Supp. 354, at page 358. To do otherwise is to disregard established principles and to undertake to chart a new course of judicial construction with the hope of successfully prophesying "foreshadowing trends" of

judicial action. Failure of the lower court to respect the doctrine of *stare decisis* leads to confusion. Failure to do so in this case disturbs the balance between state and Federal jurisdiction.

Conclusions

1. (a) The Federal Court has jurisdiction under the Diversity Statute.

(b) The plaintiffs being corporations are not entitled to the privileges and immunities of natural persons secured by the Fourteenth Amendment.

2. This Court may not inquire into the motives of the members of the General Assembly actuating them in passing the statutes but may consider legislative history when determining the meaning of statutes being construed.

3. While it is my view that the suits are premature, the fact that jurisdiction exists under the Diversity Statute coupled with the language of the Supreme Court in Doud v. Hodge, and some of the other cases considered, the proper course is to retain the case on the docket of this Court and continue them generally until the Acts have been given a definitive construction by the Courts of Virginia before the Federal Court undertakes to test their validity measured by the Federal Constitution.